BENDERSON DEVELOPMENT COMPANY, INC., Respondent, v SCHWAB BROS. TRUCKING, INC., et al., Defendants; GLENS FALLS INSURANCE COMPANY, Appellant; DAVID D. BAKER, Respondent.

Fourth Department; November 10, 1978

448

APPEARANCES OF COUNSEL

*Brown, Kelly, Turner, Hassett & Leach (Frederick Turner* of counsel), for appellant.

*Duke, Holzman, Yaeger & Radlin (Emanuel Duke* of counsel), for Benderson Development Company, respondent.

*Miserendino, Krull & Foley (Samuel Miserendino* of counsel), for David D. Baker, respondent.

### OPINION OF COURT

DILLON, J.

Defendant Glens Falls Insurance Company (Glens Falls) appeals from a monetary judgment in favor of plaintiff Benderson Development Company, Inc. (Benderson) following a nonjury trial. The action arises out of two agreements, one dated October 16, 1964, and another nearly identical agreement dated December 4, 1964, between Benderson and Glens Falls. Both agreements were made in connection with a series of short-term loans made to Schwab Bros. Trucking, Inc. (Schwab Bros.) by Benderson.

Schwab Bros. was the successful bidder on a public improvement project to build a section of the Kensington Expressway in the City of Buffalo. Glens Falls issued performance and

materialmen's bonds guaranteeing to the State of New York faithful performance of the contract by Schwab Bros., as well as the payment of subcontractors', laborers' and material-men's claims under the contract. As security for the bonds, Glens Falls took from Schwab Bros. an assignment for all moneys due or to become due under the Kensington Express-way contract.

Prior to obtaining the award of the Kensington Expressway project, Schwab Bros. began work on other public improve-ment contracts both in the State of New York and in the State of Michigan. Glens Falls had also provided performance and materialmen's bonds to the public entities on those proj-ects. As it became apparent that Schwab Bros. was unable to finance this expanding series of public improvements, Philip Schwab, the principal in Schwab Bros., with the assistance of David D. Baker (Baker), the agent and manager of the Glens Falls Buffalo branch, obtained a series of short-term loans to cover the costs of continuing work on the projects. To secure these loans, Schwab Bros. assigned to the lenders the progress payments, earned or to be earned, under the respective public improvement contracts. However, since Schwab Bros. had previously assigned the same progress payments to Glens Falls in connection with the surety bonds for the same proj-ects, agreements were entered into between Glens Falls and the lenders, giving the lenders first rights to any progress payments made under the contracts. One such agreement was executed by Schwab Bros., Benderson and Glens Falls on October 16, 1964 in relation to the Kensington Expressway contract. In pertinent part, the agreement reads as follows:

"WHEREAS, Surety has obligated and bound itself upon the following bonds, to wit:

"(a) Performance bond No. 97-16-87 in the amount of Two Million Seven Hundred Thirty-One Thousand Eight Hundred Thirty Dollars ($2,731,830.00) guaranteeing unto the State of New York (hereinafter called 'Owner'), the faithful perform-ance by SCHWAB BROS. TRUCKING, INC. (hereinafter called 'Con-tractor') [on the Kensington Expressway contract] and * * *

"(b) Bond No. 97-16-87 in the amount of Two Million Seven Hundred Thirty-One Thousand Eight Hundred Thirty Dollars ($2,731,830.00) guaranteeing unto Owner the payment of Sub-contractor's, laborer's and materialmen's claims upon and under the aforesaid contracts; and

"WHEREAS, under and by virtue of said bond, Surety has

been granted an assignment of certain proceeds, monies, accounts and contract rights due or to become due from Owner to Contractor; and

"WHEREAS, Lender has and will advance funds to Contractor to defray the costs of performing said contracts with Owner; and

"WHEREAS, Lender has received from Contractor, as security, an assignment of all proceeds, monies, accounts and contract rights, due or to become due, from Owner to Contractor; and

"WHEREAS, Lender and Surety wish to clarify their respective rights to the proceeds, monies, accounts, and contract rights, due or to become due, to Contractor from Owner and assigned to each of them as security, and also wish to secure the Lender from and out of all funds howsoever arising under the said contract;

"NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are acknowledged by each of the parties hereto, the parties agree as follows:

"1. Lender shall have the first and prior right to all proceeds, monies, accounts and contract rights earned or to be earned by Contractor or by the Surety by reason of work done by either of them under the aforesaid contracts, including the right to progress payments, retained percentages, funds earned but retained by the Owner, and funds unearned and retained by the Owner until performance by the Contractor and/or Surety.

"2. Surety hereby waives, subordinates, subrogates and assigns to the Lender any and all liens, security interests and rights in and to any proceeds, monies, accounts and contract rights, due or to become due, to Contractor and/or Surety from Owner, to the extent necessary for Lender to obtain a first and prior lien and security interest therein and thereto, superior to Surety, whether Surety's rights and interests arise by virtue of the assignment to Surety under the aforesaid bonds, or by virtue of work done under the contracts or bond by the Surety, or by virtue of its right to subrogation, if any.

"3. It is specifically understood between the parties hereto that any funds and amounts earned by Contractor and/or Surety shall be paid to or used for the benefit of Lender as security for amounts loaned to Contractor (including all interest and charges thereon) and Surety shall execute any and all instruments necessary to effectuate the foregoing."

Attached to the agreement was a power of attorney issued to Baker by Glens Falls.

Benderson ultimately advanced one million dollars to Schwab Bros. under this agreement. Schwab Bros., by Philip Schwab, gave Benderson a demand note for the full sum. In addition, Philip Schwab and his wife Mary Louise Schwab executed a separate instrument in which they personally guaranteed payment of the loan.

A similar loan transaction was arranged with respect to public improvement contracts in Pahokee and Belle Glade, Florida, on which Schwab Bros. was the successful bidder and Glens Falls was the surety. Schwab Bros. made assignments of progress payments under these public improvement contracts to both Glens Falls and Benderson, and on December 4, 1964 Glens Falls and Benderson executed an agreement concerning the Florida projects which is indistinguishable in terminology from the agreement of October 16, 1964. Shortly thereafter Benderson advanced Schwab Bros. $50,000 on the Florida contracts.

In February, 1965 Schwab Bros. defaulted on the Kensington Expressway and Florida projects. Glens Falls elected not to perform for Schwab Bros. on the Kensington Expressway job although demands to do so were made by Benderson and the State of New York. Additionally, on February 20, 1965 C. Irving Bush, Glens Falls' vice-president, wrote a letter to Benderson in which he asserted that Baker lacked authority to execute the agreements with Benderson on behalf of Glens Falls.

Benderson alleges that during the course of discussions preceding the execution of the assignments by Schwab Bros. and the agreements with Glens Falls, numerous representations were made by Baker to the effect that the surety, Glens Falls, was guaranteeing repayment of the loans. It is alleged that Baker repeatedly stated that Glens Falls would perform the contracts in the event of default by Schwab Bros., thereby generating a fund to repay the loans made by Benderson. Benderson alleges several alternative causes of action. It asserts that a reasonable reading of the October 16 and December 4 agreements establishes Glens Falls' obligation to step in and perform in the event of a default; or that the contract language is ambiguous and that the conduct of the parties as revealed by the circumstances surrounding the drawing and execution of the agreements evidences an intent

to bind Glens Falls to an agreement to perform in the event of Schwab Bros.' default; or that the court should reform the agreements on the basis that they are the product of mutual mistake by the parties in omitting a specific term obligating Glens Falls to perform; or that reformation is required on the ground of unilateral mistake in such omission induced by fraud and misrepresentation on the part of Glens Falls.

Glens Falls alleges that its agent Baker lacked authority to execute the October 16 and December 4 agreements, and that the agreements to subordinate Glens Falls' interests in the progress payments were beyond the scope of Baker's power of attorney. Glens Falls contends that Benderson knew or, with reasonable care, could have learned that Baker was operating beyond the scope of his authority. Glens Falls further alleges that the failure to memorialize Baker's alleged promise that Glens Falls would answer for Schwab Bros.' debt or default is in derogation of the Statute of Frauds (General Obligations Law, § 5-701). Additionally, Glens Falls contends that the agreements do not, by their express terms, guarantee repayment to Benderson, nor do they require Glens Falls to perform in the event of Schwab's default. Glens Falls also charges Benderson with inequitable conduct, thus foreclosing its entitlement to reformation, and contends that Benderson is not a proper party to assert a claim for $300,000 of the sum advanced to Schwab Bros.

In his answer, Baker denied making representations that Glens Falls would guarantee to repay Benderson or perform the work in the event of Schwab Bros.' default. Baker admits executing the agreements of October 16 and December 4, but claims that he was "under the mistaken impression and belief that he had authority to do so". Baker also contends that the alleged oral promises and representations alleged in the complaint were void and unenforceable under the Statute of Frauds.

Philip Schwab and Schwab Bros. Trucking, Inc. did not serve answers and default judgments were entered against them. The action as against Mary Louise Schwab, one of the personal guarantors of the loans, was dismissed on the ground that the claims had been discharged in bankruptcy.

The trial court determined that a reasonable reading of the agreements obligated Glens Falls as surety to perform Schwab Bros.' contracts in the event of default and that by doing so Glens Falls guaranteed repayment of the Benderson loans.

Though unnecessary for its result, the court alternatively found that Benderson was entitled to reformation of the agreement obligating Glens Falls to complete the contract work in the event of Schwab Bros.' default. The trial court found ample authority under the power of attorney for Baker to enter into the agreements as they were construed. The court further found that Glens Falls acquiesced in similar financing arrangements and agreements, previously executed by Baker on other Schwab Bros. projects. Resolved in Benderson's favor were those questions raised in the answer regarding Benderson's inequitable conduct and its incapacity to sue for recovery of the full amount of the loans. Glens Falls, having admitted that it elected not to perform either the Kensington Expressway or the Florida public improvement contracts upon Schwab Bros.' default, was found to have breached its contractual obligation to Benderson and was held liable for the full amount of the advances Benderson made pursuant to the agreements. Lastly, the court determined that Baker acted in a representative capacity as attorney in fact for Glens Falls, and dismissed the complaint as to him.

Initially, we address the question of Baker's authority to execute the agreements on behalf of Glens Falls. As noted, appended to each agreement was a copy of the power of attorney which was issued to Baker by Glens Falls in April, 1964. The power of attorney appointed Baker "to execute * * * as surety, bonds, undertakings, stipulations, consents and all contracts of suretyship in favor of all obligees" and also provides that it is unlimited both as to character and amount.

Glens Falls' assertion that Baker lacked authority is based upon its view of the power of attorney. It is claimed that the agreements made with Benderson are not the kind of agreements Baker could sign pursuant to that instrument. According to Glens Falls, the Benderson agreements may not be considered "bonds, undertakings, stipulations, consents [or] contracts of suretyship" which Baker was authorized to sign "as surety". In support of this position, Glens Falls offers definitions of those terms in accordance with its understanding of their relationship to the suretyship function. Thus, it maintains that "undertaking" refers to a promise for the performance of some act required in a judicial proceeding; "stipulations" are to be defined within the context of an admiralty proceeding; and "consent" means an acknowledg-

ment by a surety that its bond continues to apply to a subsequently modified contract. It is argued that the terms used in the power of attorney have specific, limited meanings under suretyship law and they may not properly be read otherwise.*

■ In dealing with Baker, however, we do not believe that Benderson's peril was that great. A power of attorney is to be interpreted so as to accomplish its apparent purpose *(Bradford Co. v Dunn,* 250 NY 461, 466). It should be construed according to the natural meaning of its words, bearing in mind the purpose of the agency and the needs for its fulfillment. The plain and reasonable meaning of the words used must be applied in harmony with the circumstances presented (2 NY Jur, Agency, § 69).

■ Baker's evident purpose in entering into the agreements with Benderson was to protect Glens Falls against the exposure to liability under the performance and the labor and material bonds it had written for Schwab Bros. It is undisputed that Glens Falls was aware that Schwab Bros. had overextended itself and that it was inadequately capitalized. By assisting Schwab Bros., Baker was obviously motivated by the desire to conserve the financial resources of Glens Falls. Thus viewed, it reasonably follows that the Benderson agreements arose in connection with the bonds which Glens Falls previously had issued. There is no dispute that Baker had the express authority to execute such bonds and since the Benderson agreements were incident thereto, we conclude that he also had the authority for their execution.

By entering into these agreements, Glens Falls agreed that Schwab Bros.' assignment of the progress payments to Benderson was to take precedence over the assignment of the same payments previously made to it. Under suretyship principles, a surety may be released from its obligation where the debtor and the creditor enter into agreements which impair the collateral security. In order to protect itself from such a result, the creditor should obtain a consent from the surety (57 NY Jur, Suretyship and Guaranty, § 202). Glens Falls has characterized the agreements in issue as "subordination agreements". Accepting this view, they may also be described as "consents" by Glens Falls to assign the proceeds of the con-

---

* In an attempt to convince the trial court of this position, Glens Falls sought unsuccessfully to introduce the testimony of an attorney who specialized in the field of suretyship law.

struction contracts to Benderson in potential derogation of its suretyship rights. It was within Baker's express authority to execute such documents.

■ Furthermore, sufficient grounds are presented to warrant the finding that Baker had apparent authority to execute the agreements. It is established that Glens Falls appointed Baker as the manager of its Buffalo branch and pursuant to its policy of decentralization, authority was delegated to the lowest competent level. The company furnished him with its unlimited suretyship power of attorney and also relied upon him to "run the show" insofar as the Schwab Bros. account was concerned. Moreover, when Benderson was initially approached concerning the loans, two agreements with other lenders, which Baker had executed on behalf of Glens Falls and which were virtually identical to the agreements in controversy, had then been in effect for a period of months. The agreements furthered the purposes of Glens Falls and in the circumstances presented, neither Benderson's belief that Baker was acting within the scope of his authority, nor his failure to inquire further, was unreasonable. Glens Falls allowed Baker to represent that he had the requisite authority and it may not now be denied (see *Wen Kroy Realty Co. v Public Nat. Bank & Trust Co.,* 260 NY 84).

■ Glens Falls correctly contends, however, that the agreements, as they now read, do not require that it complete the construction contracts in the event of Schwab Bros.' default. Neither their language, nor that of the bonds to which they refer, imposes that obligation. Nor do the agreements express a guarantee by Glens Falls to pay Benderson if Schwab Bros. should fail to do so.

■ It is the primary rule of contractual construction that "when the terms of a written contract are clear and unambiguous, the intent of the parties must be found therein [citations omitted]" *(Nichols v Nichols,* 306 NY 490, 496). The words and phrases used in the agreement must be given their plain meaning so as to define the rights of the parties *(Laba v Carey,* 29 NY2d 302, 308) and in the absence of ambiguous terms, we have no occasion to resort to a consideration of the circumstances existing when the contract was entered into, the situation of the parties or the subject matter of the agreement (see *67 Wall St. Co. v Franklin Nat. Bank,* 37 NY2d 245, 248-249; cf. *Wilson v Ford,* 209 NY 186, 196). Additional obligations may not be imposed upon a party to a

contract under a theory of contractual construction *(Laba v Carey, supra)*.

■■ Those well-established principles preclude a consideration of the parol evidence offered by Benderson in its effort to establish what it contends the parties meant to accomplish. The parol evidence rule does not allow the reception of oral evidence unless uncertainty or doubt springs from the written agreement *(Loch Sheldrake Assoc. v Evans,* 306 NY 297; *Thomas v Scutt,* 127 NY 133; Fisch, New York Evidence, § 58). Here the agreements state that the "Lender shall have the first and prior right to all proceeds, monies, accounts and contract rights earned or to be earned by the Contractor or by the Surety by reason of work done by either of them * * * and funds unearned and retained by the Owner until performance by the Contractor and/or Surety." In reliance upon these as well as the other references in the agreements to moneys earned by the surety and to performance of the construction contract by the surety, plaintiff contends that the surety was obligated to perform the construction and to generate funds in the event of the contractor's default. As indicated, however, the language of the agreements is clear and it simply fails to mandate performance by the surety. Thus parol evidence was improperly received and considered by the trial court in ascertaining their meaning.

■ With regard to the causes of action seeking reformation of the agreements, however, the extrinsic evidence was properly admitted *(Brandwein v Provident Mut. Life Ins. Co.,* 3 NY2d 491, 496; *Sadock v Mitrani,* 248 App Div 470). When such relief is sought, it must be established by clear, positive and convincing evidence. "Reformation may not be granted upon a probability nor even upon a mere preponderance of evidence, but only upon a certainty of error [citations omitted]" *(Amend v Hurley,* 293 NY 587, 595; see, also, *Nash v Kornblum,* 12 NY2d 42; *Ross v Food Specialties,* 6 NY2d 336, 341; *Vance Metal Fabricators v Widell & Son,* 50 AD2d 1062).

In support of Benderson's claim for reformation, based upon mutual mistake, evidence was introduced which established that both Baker and Nathan Benderson, plaintiff's principal, believed that Glens Falls was obligated to perform in the event of the contractor's default and that such performance would generate a fund to repay Benderson. Indeed, not only did Benderson testify that this was his belief, but Baker also testified that it was his understanding that Benderson was to

be treated as a supplier, and that under the agreement Glens Falls was obligated to "step in" and perform upon Schwab Bros.' default. Additionally, Baker executed identical agreements with other lenders both before and after the Benderson agreements. Baker testified, concerning those other agreements, that the lenders were to be treated as suppliers under the payment and performance bonds issued by Glens Falls, and that if Schwab Bros. defaulted on those contracts, Glens Falls would have to arrange for someone else to complete the jobs. The proof of Baker's representations and understandings with the other lenders is strongly supportive of plaintiff's position, particularly in the absence of any evidence indicating that Baker intended to treat Benderson differently under the same agreements which were used with the other lenders.

■ The evidence that the parties were mutually mistaken as to the meaning of the agreement with respect to the obligation of Glens Falls to perform in the event of the contractor's default, is clear, positive and convincing, and in view of the strength of the evidence, the fact that Benderson received the advice of counsel will not preclude reformation (cf. *Lazarus v Bowery Sav. Bank,* 16 NY2d 793). In such circumstances, reformation will be granted to reflect and express the true intent and understanding of the parties (see *Lazarus v Bowery Sav. Bank, supra; Meyer v Lathrop,* 73 NY 315; *Pitcher v Hennessey,* 48 NY 415; 6 NY Jur, Reformation of Instruments, §§ 41-44; see, also, *Nash v Kornblum,* 12 NY2d 42). Thus the agreements should be reformed to require performance by Glens Falls upon default by the contractor.

We have considered Glens Falls' argument that even if Baker did guarantee performance, his promise would alter the obligations of Glens Falls under the performance bonds which only required payment by Glens Falls but did not entitle it to complete the work. It is argued that it could not enter into such an agreement without the consent of the obligees on the bonds. With respect to the Kensington Expressway contract, however, Glens Falls admits that the State of New York requested it to complete the work but that it declined to do so. Thus Glens Falls was in a position to honor the Benderson agreements, as reformed. Insofar as the Florida jobs are concerned, Glens Falls makes no assertion and presents no evidence of any impediment to completing that work.

Glens Falls next asserts that $300,000 of the money advanced to Schwab Bros. was "sold" to Bison Factors, a sole

proprietorship owned and operated by Nathan Benderson, and that since Bison Factors is not a party in this action, recovery may not be had in that amount. While conflicting evidence was presented on this point, it is clear that no funds were issued directly from Bison Factors to Schwab Bros. The trial court found that the subsequent transfer of the money from Bison Factors to plaintiff was motivated by tax considerations and that it did not constitute an assignment. Since the finding of the trial court is supported by the evidence in the record, it will not be disturbed (see *67 Wall St. Co. v Franklin Nat. Bank,* 44 AD2d 825, affd 37 NY2d 245; *Burnett Process v Richlar Ind.,* 55 AD2d 812; *Bandike Assoc. v B.B.M. Realty Corp.,* 44 AD2d 622; *Collins v Wilson,* 40 AD2d 750).

On review of the remaining contentions of Glens Falls, we find that they do not require a different result.

The judgment should be affirmed.

MARSH, P. J., CARDAMONE, SIMONS and SCHNEPP, JJ., concur.

Judgment unanimously affirmed, with costs.