**PANTONE, INC., Plaintiff,**

v.

**ESSELTE LETRASET LTD., Defendant.**

**No. 88 Civ. 3101 (MP).**

United States District Court,
S.D. New York.

July 25, 1988.
As Amended July 29, 1988.

Blum Kaplan by Steven B. Pokotilow, Anita K. Yeung, Charles P. LaPolla, New York City, for plaintiff.

Darby & Darby by Morris Relson, Beverly B. Goodwin, Andrew Baum, New York City, for defendant.

## OPINION AND DECISION

MILTON POLLACK, Senior District Judge.

Pantone, Inc., the plaintiff, offered to license the use of its federally registered trademark, "PANTONE," to Daler–Rowney Ltd., in connection with the latter's manufacture and sale of designers gouache,[1] air brush colors and color markers,[2] and its distribution of coatings color paper, based on the colors of the PANTONE Professional Color System.

Esselte Letraset Ltd. ("Letraset"), the defendant, notified Pantone and Daler–Rowney that it would sue to prevent the grant of such a license, claiming that contracts entered into in 1972 by plaintiff and defendant restrict Pantone from licensing its trademark "PANTONE" to anyone oth-

er than Letraset on any product generally recognized as a commercial artist supply.

Thus, this controversy centers on the construction to be given to a non-competition covenant in the 1972 contracts and whether this and other contractual provisions give Letraset the right to exclude Pantone's use or license of the "PANTONE" trademark on any commercial artist supplies.

Both parties seek a declaratory judgment on the scope of the rights under the 1972 contracts and either consequential injunctive relief or specific performance as the declaration may require. Plaintiff also seeks damages and an accounting from defendant for alleged unfair competition and tortious interference with Pantone's prospective business relations.

Jurisdiction of the subject matter and over the parties exists in this Court and venue of the suit is proper.

A temporary restraining order on consent was entered restraining defendant from taking the threatened legal action to prevent Pantone and Daler–Rowney from completing an agreement to license the trademark "PANTONE" for the uses mentioned above. No action to complete such an agreement was taken by plaintiff. Trial on the merits was, on consent, advanced and consolidated with the hearing on plaintiff's application for a preliminary injunction, pursuant to Fed.R.Civ.P. 65(a)(2). Expedited discovery was granted to both sides.

For the reasons shown hereafter, judgment on the merits will be granted to defendant with appropriate relief.

### Background
### The Language of Color

Pantone is the creator of numerically organized systems for communicating color. Such systems have been developed to be assured of a match of the color selected to

---

**1.** Gouache is an opaque water-based artist paint.

**2.** Although the initial draft of a license agreement from Pantone to Daler–Rowney included color markers as a licensed product, the managing director of Daler–Rowney testified that the

technology involved in producing an opaque marker was not achievable and that his firm's manufacture of these color markers is no longer planned.

that reproduced on the product to which the color is ultimately applied. To achieve this color match, a complete color communication system includes (1) *color specification materials*—books from which colors can be selected, and specified by number or name; (2) *color presentation materials*—consumable supplies, such as colored papers, markers and other materials, which are used to create comprehensive mock-ups of a proposed use of the colors for approval; and (3) *color reproduction materials*—the inks, paints and dyes used to produce the final product. In addition, color proofing materials are used to check the color fidelity of the final products. However, the key element—the system within the system—is the copyrighted organizational scheme. It is this color system to identify precisely, by numbers or names taken from color charts, shades of color so identified, from selection to final application, that gives value to the "PANTONE" name in all its employments.

Pantone had created its innovative color system for the graphic arts and printing industries known as the Pantone Matching System ("PMS") in the early 1960s. The first PMS color books were published in 1963. Pantone developed ink formulae and licensed printing ink manufacturers to produce these inks under the "PANTONE" mark. To complete the system, Pantone also developed and began to market certain color presentation materials: color paper, color/tint overlay sheets and color markers.

Letraset was an international manufacturer and distributor of art products with strong marketing organizations in many countries. It produced and sold color papers, color film overlays and color markers under its own trademarks and was interested in coordinating these products to a color numbering system and, in fact, was developing its own color communications system.

Pantone and Letraset realized that a partnership would be beneficial to both parties. Pantone had the PMS system, technical expertise and associations with printers and printing ink manufacturers. Letraset had international marketing strength in connection with art material stores.

### The 1972 Transaction

In 1972 Pantone sold its color presentation materials business to Letraset and granted an exclusive license to Letraset to use the mark "PANTONE" on this business. For business reasons proffered by Letraset, the key provisions of this transaction were ultimately divided between two separate documents—the Agreement and License ("Trademark Agreement") and the Purchase and Supply Agreement ("Purchase Agreement"). Under the Agreements, Letraset would phase out production of its own color presentation materials.

Although there have been disagreements over the years, this arrangement has been highly profitable to both parties and continues so by automatic extensions of successive additional two-year terms.

### Later Developments

At the time of the 1972 Agreements, Pantone had no other color communication system other than the PMS system intended for use by the print media and no other system was then contemplated. Eventually, however, Pantone began to receive comments from PMS users outside the printing industry. Professionals in the industrial, architectural, interior design, beauty and fashion fields were seeking a color communication system for their non-print businesses; however, the colors established for printing ink did not adequately serve the non-print media. They particularly commented on the limited palette and its sparsity of soft pastels and earth tones in the range of colors, to be addressed.

In response to this impetus, Pantone undertook development of a color communication system using essentially the same matching idea but specifically designed for non-print uses. The first Professional Color Guide for the so-called PANTONE Professional Color System ("PCS") was published in 1984. In addition to providing a wider range of colors for non-print media, the colors in the non-print PCS system are opaque or translucent whereas the PMS colors, which are intended for printing inks,

are with few exceptions transparent.[3] Each PCS color is technically distinct from any PMS color; however, about 20% of the PCS colors can be matched to a PMS color within an acceptable range of tolerance. The PCS system also utilizes a distinct numbering scheme.[4]

After developing the new PCS range of colors, Pantone began to develop and market color presentation materials, such as coatings color paper, coordinated to the non-print system and to discuss the development of a set of colorants and vehicles to reproduce the desired range of colors and possible licensing arrangements with manufacturers of dyestuffs and paints. Various parties were licensed to distribute the PCS color books for non-print uses, including Letraset which was granted a non-exclusive worldwide license to distribute PCS color books in art material stores and to other of Letraset's dealers, as well as an exclusive right in certain geographical areas to distribute PCS coatings color paper.

According to Pantone, however, Letraset was not interested in manufacturing new color presentation materials coordinated to the non-print system.

*Discussions with Daler–Rowney*

Early in 1987 Pantone entered into discussions with Daler–Rowney about licensing that firm to manufacture and sell, under the "PANTONE" name, lines of designers gouache and air brush color coordinated to the PCS system. Daler–Rowney is an established English manufacturer of fine art and commercial artist materials. The offer of that license by Pantone is questioned in this suit and is currently outstanding pending the resolution of the disputed construction of the 1972 contracts.

On February 22, 1988, Pantone first advised Letraset of its intention to license Daler–Rowney to manufacture and sell a PCS–based range of consumable products

and, obviously also, to use the "PANTONE" trademark on those products. On April 27, 1988, Letraset informed Daler–Rowney that it viewed the potential licenses and use of the "PANTONE" trademark as a breach of its agreements with Pantone and threatened to seek a court injunction unless Daler–Rowney gave its assurance within seven days that it would not distribute these commercial artist supplies under the "PANTONE" brand.

That action by Letraset precipitated the filing of this lawsuit.

*The Declaratory Judgment Claims*

*The Standards For Decision*

The starting point in any contractual dispute must be the language of the agreement itself. The Trademark and Purchase Agreements each provide that it is governed by New York and federal law. Furthermore, both parties agree that the two Agreements are in pari materia, intended as manifestations of a single contract, and must be read together as a single contract. *See Lowell v. Twin Disc, Inc.*, 527 F.2d 767, 769–70 (2d Cir.1975) (applying New York law).

■ "The objective in any question of the interpretation of a written contract, of course, is to determine 'what is the intention of the parties as derived from the language employed.'" *Hartford Accident & Indemnity Co. v. Wesolowski*, 33 N.Y.2d 169, 171–72, 305 N.E.2d 907, 909, 350 N.Y. S.2d 895, 898 (1973) (quoting 4 S. Williston, A Treatise on the Law of Contracts § 600, at 280 (3d ed. 1961)); *see also Rock Ridge Townhouses, Inc. v. Village of Tupper Lake*, 99 A.D.2d 914, 914, 472 N.Y.S.2d 521, 523 (3d Dep't 1984). The intention of the parties must be gleaned from all corners of the documents, rather than from sentences or clauses viewed in isolation. *Tougher*

---

**3.** In a transparent color, the perceived color is from light reflected off the surface of the underlying substrate, such as the paper on which the color is printed. In an opaque color, the perceived color is from light reflected off the surface of the color itself. Consequently, the appearance of transparent colors will vary greatly with differently colored substrate.

In translucent colors, the light is only partially reflected off the surface of the substrate.

**4.** Whereas the PMS numbering system was essentially sequential, the PCS numbering system is an information-bearing notation which fixes the location of the color within a theoretical color cylinder.

*Heating & Plumbing Co. v. State*, 73 A.D. 2d 732, 733, 423 N.Y.S.2d 289, 290–91 (3d Dep't 1979); *see Williams Press, Inc. v. State,* 37 N.Y.2d 434, 440, 335 N.E.2d 299, 302, 373 N.Y.S.2d 72, 77 (1975). Furthermore, "[w]here contracts are in writing the rights of the parties should be determined by the plain meaning of the language used, if possible." *Schuler–Haas Electric Corp. v. Aetna Casualty & Surety Co.*, 49 A.D. 2d 60, 63, 371 N.Y.S.2d 207, 209 (4th Dep't 1975), *aff'd mem.*, 40 N.Y.2d 883, 357 N.E. 2d 1003, 389 N.Y.S.2d 348 (1976).

### The Provisions of the Contracts

In the Trademark Agreement, Pantone granted to Letraset

an exclusive license under Pantone's present and future rights under the common law and by registration, to use, throughout all countries in which Pantone may have or may hereafter acquire such rights, the mark "PANTONE" (or any other Licensed Trademark) on or in connection with any GAM. [Article II]

"GAM" or "Graphic Art Materials" are narrowly defined in the Trademark Agreement to mean

the [enumerated] art material products displaying color or capable of color reproduction, in which said color displayed or reproduced is one of the colors of "The Pantone Matching System" [Article I(1)]

"The Pantone Matching System" is, in turn, specifically defined by the numbers of the copyright registration certificates of the publications which embody that color system. Article I(2).

The enumerated art material products which are defined as GAM are the three products which had previously been marketed by Pantone (color paper, color/tint overlay and color markers), "[a]ny material changes in and material improvements of the foregoing," and "new products added to the line in the manner provided." Article I(1)(a)–(e).

The Trademark Agreement then provides that

The following provisions shall apply to new products generally recognized as commercial artist supplies developed by Pantone during the term of this agreement:

(a) Pantone shall first offer the exclusive right of manufacture and sale to Letraset. [Article IV(10)(a)]

If Letraset fails to accept the said offer within six months,

(b) ... Pantone shall have the right to offer such manufacture and distributorship to any other party ...

on business terms not more favorable than those proposed to Letraset. [Article IV(10)(b)]

As discussed above, Pantone sold its color presentation materials business to Letraset (and Letraset covenanted to phase out its similar business under its own trademarks) in the same transaction of which the Trademark Agreement was a part.

In exchange for Letraset giving up its own (and at that time larger) related business, investing its marketing effort in Pantone's mark and subjecting itself to royalty payments, Letraset bargained for and obtained from Pantone in the Purchase Agreement the restrictive covenants that

Pantone will not license or otherwise allow any person, firm or business entity to use or itself use the trademark "PANTONE" or any other Licensed Trademark.

(i) on or in connection with any products which are in direct competition with GAM,

(ii) on any products generally recognized as commercial artist supplies, except as provided in Article IV(10)(b) of the [Trademark Agreement].[5]
[Paragraph 28(2)]

### The Crux of the Dispute

■ The crux of the dispute between the parties lies in the scope of the clauses in Article IV(9) and (10) of the Trademark

---

**5.** The exception gives Pantone a right to offer a new product which it has developed for manufacture or distribution to others if the new product has been first offered to and turned down by Letraset. This privilege does not express or include another's use of the trademark.

Agreement relating to the *"new products"* which could be added to the defined list of what is "GAM" as set forth therein; and, *"any products* generally recognized as commercial artist supplies" dealt with in Paragraph 28(2)(ii) of the Purchase Agreement.

There has been much confusion caused by the plaintiff's slurring over the distinction between what each clause refers to and referring to them as though their terms were identical and thus, mistakenly ascribing precisely the same scope thereto in both contracts.

Article IV(9) and (10) of the Trademark Agreement provides methods to add new products to the line of products defined as "GAM" and subject to the license and royalties. It therefore refers to *"new* products."

Paragraph 28(2) of the Purchase Agreement is a noncompetition restrictive agreement to protect Letraset's investment in the mark "PANTONE" in the commercial artist supplies field. It therefore broadly refers to *"any* products," not limited to "GAM."

Pantone claims that the general product category mentioned in both Agreements, viz., "generally recognized as commercial artist supplies" was intended to express the same products in the two categories. Concededly the terms "new products generally recognized as commercial artist supplies" used in Article IV(9) and (10) describe the universe of products that are "potential GAM," i.e., the field from which new products developed by either of the parties fall within the new product provisions of the license. Consequently, Pantone argues, since all "GAM" are, by definition, coordinated to the PMS system, all products in the commercial artist supplies field (whether new "GAM" or not) must be capable of coordination with the PMS system. Thus, because the proposed gouache and air brush color are instead coordinated to the non-print system (and arguably not capable of coordination with the PMS system), Pantone claims that they are not subject to the covenanted restriction contained in Paragraph 28(2)(ii) of the Purchase Agreement.

Letraset, on the other hand, points to the difference in the products referred to in the separate Agreements. The non-competition covenant in the Purchase Agreement, both sides readily admit, was intended for Letraset's protection in the commercial artist supply field. The prohibition against licensing the trademark was placed against *"any* products" generally recognized as commercial artist supplies. Paragraph 28(2)(ii) connotes precisely what it says, and gouache and air brush color are clearly in the universe of any products generally recognized as commercial artist supplies and subject to the non-competition clause. Letraset asserts that Pantone covenanted to refrain from licensing its trademark to others for use, or using the trademark itself, on any such products. Those products were not the limited group dealt with in the Trademark Agreement, the new developments that were or could become "GAM," as that is defined in the Agreements. The exception involved in Letraset's right of first refusal in the Purchase Agreement pertaining to new product was designed to permit Pantone to manufacture or distribute competing commercial artist supplies, but Letraset's exclusive right to the trademark remained undisturbed.

What is identical between the two clauses is so much as reads "generally recognized as commercial artist supplies." Those words are descriptive of the general class of products with which each of the respective contracts is concerned. The scope of the products embraced by the category described by the respective Agreements was then expressed by prefacing the clauses with the identifying words "new products," related to "GAM" or "new GAM" in the general category of commercial artist supplies; and "any product" whatsoever in the category of commercial artist supplies. Had the parties desired to shorten the totality of the two dissimilar references, they could have used the equivalent references of "new commercial artist products" that augmented the "GAM" being discussed there and "any commercial artist products" whatsoever.

It is unnecessary to enter into a debate of the scope of what constitutes "any products generally recognized as commercial artist supplies" since the gouache and air brush color are undeniably such supplies—and they are the products at issue herein.

Were there any ambiguity in the intended scope and application of the phrase "any products generally recognized as commercial artist supplies," which we believe there is not, the negotiating history conclusively settles the correct scope and application thereof consistently with the foregoing and reinforces the plain meaning of the clear English language in the Purchase Agreement.

### The Negotiating History

The well-settled rule in New York is that circumstances extrinsic to a contract will not be considered when the intention of the parties can be gathered from the plain and unambiguous language of the instrument itself. *West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*, 25 N.Y.2d 535, 540, 255 N.E.2d 709, 711, 307 N.Y.S.2d 449, 452 (1969), *remittitur amended*, 26 N.Y.2d 969, 259 N.E.2d 483, 311 N.Y.S.2d 13 (1970). Pantone claims that the intent of the parties is not unequivocally clear from the language of the contracts, but that a common scope was intended for the dissimilar clauses.

"When the language of the agreement is patently ambiguous, the Court may look to prior negotiations to determine what was intended." *Bird v. Computer Technology, Inc.*, 364 F.Supp. 1336, 1343 (S.D.N.Y. 1973); *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 11, 280 N.E.2d 867, 872, 330 N.Y.S.2d 33, 40 (1972). Such oral evidence does not violate the parol evidence rule since it does not alter or vary the writing or insert an additional term, but simply explains the meaning of a term. *Bird*, 364 F.Supp. at 1343. Further, "[t]he consideration of a written instrument is always open to inquiry, and a party may show that the design and object of the agreement was different from what the language, if considered alone, would indicate." *Baird v. Baird*, 145 N.Y. 659, 664, 40 N.E. 222, 224 (1895); *see also Hutchison v. Ross*, 262 N.Y. 381, 398, 187 N.E. 65, 72 (1933).

To investigate Pantone's claim, the Court took proof of the negotiating history of the 1972 contracts. The weight of the credible evidence adduced in the negotiating history reinforces that the design and object of the Agreements was the same as what the language and content of the two clauses, if considered alone, would indicate. Letraset was granted exclusivity in the trademark "on any products generally recognized as commercial artist supplies."

Pantone's primary witness as to the negotiating history of the Agreements was its former lawyer, who was its chief negotiator and a draftsman of the 1972 Agreements. He testified that the term "products generally recognized as commercial artist supplies" was confined to and used as a shorthand in the new product provisions of the Trademark Agreement (Article IV(9) and (10)). He said that the lawyers were initially given a list of products which the principals had discussed as potential "GAM" for future development. He stated that this list became unwieldy, as did proffered attempts to describe the intended class of products, so the shorthand was substituted. He claimed that the intent was always to refer to "potential GAM" or "future GAM," but he also said this same application and meaning was intended for the covenants of the contemporaneous Purchase Agreement. His view was that the non-competition clause in the Purchase Agreement was no more than a reciprocal of the license granted to Letraset. He had no corroboration whatsoever for his views or testimony; he had none of the successive drafts of papers, no files, no memoranda; he kept no contemporaneous record of what was discussed; and the only aid for his testimonial assertions was alleged memory of events and discussions of sixteen years previously in the face of the final Agreements themselves, the words of which do not bear out that memory.

Letraset's witness as to the negotiating history was its principal negotiator on the 1972 Agreements. His testimony was corroborated by documents which were

presented into evidence, circumstances and probabilities, and the dissimilar language itself of the scope of the clauses. He presented and explained two key documents—late negotiation drafts of the two contracts under examination. At that point, relatively late in the negotiations, the contracts were in almost final form; however, as yet the draft of the Purchase Agreement did not include non-competition covenants by Pantone [*proto* Paragraph 28] and the Trademark Agreement was restricted to new product provisions then expressed as "new art material products developed by Letraset" [*proto* Article IV(9)] and "new art material products developed by Pantone" [*proto* Article IV(10)], rather than the final form of the clause reading "new products generally recognized as commercial artist supplies."

Letraset's witness testified that at that point the glaring omission of the intended exclusivity of the use of the "PANTONE" trademark that Letraset expected to obtain, became manifest to him.

Late in the drafting process, he came to realize that Article II of the Trademark Agreement, which gave Letraset the exclusive right to use the "PANTONE" name on "GAMS," omitted to give Letraset the intended exclusivity of the use of the name on any artist materials.

Without that exclusivity, Letraset would not sign the Agreements. He testified that Letraset had bargained for this exclusivity all along and he explained the unintended omission to Pantone's negotiators. This omission was viewed, according to his testimony, as only a drafting problem, not as a business problem because there was very little disagreement between the two parties about the clear business agreement which existed at that point in the drafting process. Consequently, the non-competition clauses—the negative clauses—in Paragraph 28(2) of the Purchase Agreement were quickly added to the drafts.

Letraset's witness explained that the term "commercial artist supplies" emerged in place of "artist materials" or "artist supplies" because Letraset was only in the commercial artist supplies field and there was no purpose of the parties to restrict Pantone from licensing the trademark for fine art supplies manufacturers.

Furthermore, he said that the words "generally recognized" were added to the formula to establish a relatively objective test as to the products subject to the negative covenant.

As a further corroboration of his testimony, this witness provided an unsigned copy of the preliminary "heads of agreement" reached by the principals, together with contemporaneous notes of his comments thereon, and internal Letraset memoranda and minutes of meetings. These documents were consistent with his testimony that Letraset's exclusivity as to the trademark was intended to extend beyond the narrow range of products defined as GAM and was negotiated to protect Letraset in its primary field—commercial artist supplies.[6] In a memorandum by this witness to Letraset's executive committee was an outline of the initial understanding with Pantone which reported, in relevant part:

2. Pantone would not license any other manufacturer of art materials for use of their numbers without Letraset's approval. Appendix "A" lists those already approved.

3. Pantone would not manufacture for sale any other artists' materials without Letraset's approval, whether or not linked to Pantone's color system.

In addition, the witness's marginal notes to the preliminary version of the "heads of agreement" prepared by Pantone include the following:

Note: This clause does not satisfactorily limit Pantone's ability to introduce art materials competitive to Letraset, which are not based on colour, e.g., a dry transfer. *The intention is that it should.* [Emphasis supplied.]

Less than two weeks before the Agreements in final form were signed, the de-

---

**6.** In 1972 the parties' discussed Pantone's anticipated interest in reaching the furnishings, wall coverings and interior decor market, an expanded end use for color communications. Pantone's 1972 anticipation was again mentioned in Letraset's letter of November 11, 1978 (p. 2).

fendant's witness wrote a long memorandum on his belief of the intended agreements, including the following:

> We eliminate Pantone as a future competitor in commercial art materials at least until we chose to terminate the agreement....

> We obtain exclusive rights to the name "Pantone" in the art material field and Pantone are enjoined from competing with us on dry transfers....

> Pantone must offer us any new art materials they develop, and any appropriate new products we develop will be referenced to the Pantone system at 7½% royalty....

> [The Trademark Agreement] essentially gives us the exclusive right to use of the Pantone name in the art material field, in return for a royalty payment....

> Article II Grants us the exclusive right to use Pantone's trademarks on art materials....

These contemporaneous documents support the Letraset witness's testimony of the negotiating history and corroborate by contemporaneous records the discussions that took place, the purposes to be served, the intent of the parties and reveal the reason for the clear language used in the final Agreements. His testimony that "it was absolutely fundamental that we should have security in that mark" is supported by the marketing effort that Letraset undertook to provide for the "PANTONE" brand and by the inferences from the fact that the business that Letraset was giving up in exchange for the "PANTONE" license had, at that time, far greater sales volume than the business Letraset was acquiring from Pantone.

The paper trail, while circumstantial evidence, unerringly explained how the significant clause was added to the Purchase Agreement and illumined the scope of the plain words of the Agreement.

*Surrounding Circumstances*

■ Pantone argues nonetheless that, in construing contract terms, the courts are also required to consider the surrounding circumstances at the time of execution of the contract.

Of course, under New York law, in the absence of ambiguous terms, courts have no occasion to resort to a consideration of the circumstances existing when the contract was entered into. *Benderson Dev. Co. v. Schwab Bros. Trucking Co.,* 64 A.D. 2d 447, 456, 409 N.Y.S.2d 890, 897 (4th Dep't 1978); *cf. 67 Wall Street Co. v. Franklin Nat'l Bank,* 37 N.Y.2d 245, 248, 333 N.E.2d 184, 186, 371 N.Y.S.2d 915, 918 (1975). We believe that there is no ambiguity here.

Moreover, Pantone presented no evidence of any surrounding circumstances which would suggest an intent of the parties which differs from that evident in the language of the Agreements themselves.

*Pantone's Attempt To Rewrite the Agreements*

Pantone asserts that at the time of its development of the new PCS system in 1984, Letraset never objected to the development of this system nor took the position that Letraset had an exclusive right of first refusal for products matched to this system or that Pantone would be prevented from distributing such products. Letraset never, Pantone states, objected to Pantone's distribution of PCS color specifier books through artist supply dealers and never took the position that it had a right of first refusal thereto. All this, of course, is entirely irrelevant to use of the trademark on commercial artist supplies. What Letraset has is the right to prevent Pantone or another licensee from using the mark "PANTONE" on any commercial artist supplies.[7] The PCS color specifier books are not included by the restrictive covenant since they are not products generally recognized as commercial artist supplies, even where they are sold by artist supply dealers, and Letraset claims no right to prevent their distribution under the "PANTONE" mark.

As noted many times, Pantone gave up the right to use the mark "PANTONE" on

---

**7.** Letraset's right of first refusal is limited to new products developed by Pantone which are commercial artist supplies capable of coordination with the PMS system for printing uses.

a certain class of products; it did not surrender its freedom to develop new products and markets under other trademarks. With regard to the commercial realities of the bargain, one should consider what Letraset was giving up—an existing business under its own trademarks which was at that time considerably larger than the business that it was acquiring from Pantone.

This interpretation does not, as Pantone claims, result in an "overly broad and one-sided" construction of the contracts, but rather protects the bargain that was made by the parties.

*Coatings Color Paper*

In addition to offering the manufacturing and sales license on gouache and air brush color heretofore discussed, Pantone has also offered Daler–Rowney an exclusive license to distribute PANTONE PCS Coatings Color Paper through art material retail stores within the United Kingdom. These products are commercial artist supplies. Letraset properly objects to such a license for Coatings Color Paper as a use of the "PANTONE" trademark on a product generally recognized as commercial artist supplies, and in violation of the restrictive covenant set forth in Paragraph 28(2)(ii) of the Purchase Agreement.

Coatings Color Paper is a color presentation material consisting of sheets of paper coated with paint coordinated with the colors of the PCS numbering system for non-print uses.

In 1984, Pantone informed Letraset of its development of this product and represented that the PCS-based coated paper would not be marketed to the commercial graphic artist. This use, in effect as a color swatch, was plainly represented to Letraset. On October 17, 1984 Pantone's president wrote Letraset that:

> The distribution of these color sheets will be primarily to the home decorating centers or paint stores that cater to people who decorate for themselves.

Having heard that plans of Pantone might contradict this representation, Letraset's director in charge, in a letter of July 10, 1985, promptly protested to Pantone's president:

> On the question of your plans for coated paper matched to the [PCS system], I had felt quite relaxed at the original idea that the product would be sold *through home decorating and similar outlets,* to be used *as* consumer colour *samples.* That did not seem to conflict seriously with our own marketing of the current range of Pantone by Letraset papers. If, however, your current plans are to distribute a range of [PCS] matched papers through art stores for use by designers, we would feel that would be *in conflict with* the basic principles of *our existing agreement....* [Emphasis supplied.]

Pantone's president admitted in his testimony that he understood Letraset's objection.

Sometime in July 1985, Pantone presented Letraset with samples of the PCS coated color paper product for the purpose of determining Letraset's interest in manufacturing and/or distributing the product. Letraset told Pantone it was not in a position to manufacture the product, due to limited coating capacity at its plant.

Subsequently Pantone granted affirmative exclusive licenses to Letraset to sell Coatings Color Paper through art material stores in the United States and the Caribbean in July 1986 and in Italy in January 1987. Obtaining such affirmative licenses was not in derogation of the negative covenant in Paragraph 28(2) binding Pantone; both could exist side by side.

Pantone and Letraset also negotiated for, but failed to conclude, a Pan–European license to sell this product in art material stores. Letraset had requested an exclusive license to cover Europe, but Pantone told Letraset that this was not possible because it had a pre-existing non-exclusive agreement with another distributor for the territory of Europe. No contract was made, principally because Pantone insisted on certain rules on trademark usage which were unacceptable to Letraset. These negotiations occurred in the climate of Pantone's representation that the previous distributions involved were primarily to the

home decorating centers or paint stores that cater to people who decorate for themselves as stated in Pantone's letter quoted above.

Letraset had objected in 1985 to a distribution through art stores for use by designers, as in conflict with the existing 1972 contracts. It subsequently agreed with Pantone on its own distribution of this product in other areas beyond the home decorating and similar outlets, thus making the product a commercial artist supply. In fact, apparently unknown to Letraset, Pantone and its licensees were selling Coatings Color Paper under the "PANTONE" mark through art material stores and to commercial graphic artists from the time of Pantone's introduction of the product. Pantone explains that it assumed territory other than the United States, the Caribbean and Italy was open for such broader distribution since those areas were not ceded to Letraset. Letraset was not informed by Pantone at the time of its distributorship agreements that the product already was being sold in art material stores, not being offered only through home decorating and similar outlets. It was resting on its belief that it was extremely improbable that a commercial artist would buy the product from such outlets. This, in effect, a de minimis attitude, nonetheless condoned a distribution inconsistent with the comprehensive negative covenant in Paragraph 28(2)(ii) of the Purchase Agreement prohibiting the use of the trademark on any *product* generally recognized as commercial artist supplies, irrespective of the channels of distribution.

Letraset has thus implicitly foreclosed itself from complaining of the use in home decorating and similar channels of distribution of Coatings Color Paper by Pantone and its licensees; and it cannot now complain of the use by Daler–Rowney of the trademark on this particular product if marketed through such outlets. So much of defendant's counterclaim as could be said to relate to distribution of this product in home decorating and similar outlets is equitably insupportable and the relief to which defendant is entitled herein may not

and is not intended to preclude distribution of this product through such outlets.

Letraset, however, admittedly objected at the first instance to any use of the "PANTONE" trademark on gouache and air brush color, which are clearly products subject to the restrictive covenants as commercial artist supplies.

*Credibility*

The testimony of Letraset's witnesses, on all phases of the Agreements, was consistent, credible and unimpeached and the issues of credibility are resolved in defendant's favor.

*Irreparable Injury*

■ It is elementary that the breach by Pantone of its covenant not to use, or license another to use, the trademark "PANTONE" "on any products generally recognized as commercial artist supplies" causes irreparable injury by engendering competition in violation of the Purchase Agreement and destroying Letraset's exclusivity in the trademark in the commercial artist supplies field, which the parties bargained for and agreed to. The introduction of the mark "PANTONE" on commercial artist supplies by Pantone or its licensees irreparably and unquantifiably damages Letraset's position as a distributor of commercial artist supplies under the name "PANTONE" and leads to damaging confusion in the marketplace. Injunctive relief is therefore appropriate herein.

*Pantone's Other Claims*

*Count I—Tortious Interference*

Pantone claims that Letraset tortiously interfered with its business and contractual relations with its prospective licensees and distributors by (1) having informed Daler–Rowney that execution of the proposed license agreement between Daler–Rowney and Pantone and the proposed distribution of products thereunder constitute a breach of contracts between Pantone and Letraset and (2) threatening to bring legal action against Daler–Rowney.

■ Under New York law, in order to state a claim for tortious interference with contract, the complaint must first allege

the existence of a valid contract. *Demalco Ltd. v. Feltner*, 588 F.Supp. 1277, 1280 (S.D.N.Y.1984); *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120, 134 N.E.2d 97, 99, 151 N.Y.S.2d 1, 5 (1956). No existing contract between Pantone and Daler–Rowney was either pleaded or proved and, therefore, that portion of Pantone's claim alleging tortious interference with contractual relations will be dismissed with prejudice.

■ Pantone's claim, however, may also be read as alleging intentional interference with prospective economic advantage. "In addition to protecting a party against a third party's unlawful interference with an executed contract New York recognizes a cause of action for interference with pre-contractual relations 'where a party *would* have received a contract but for the malicious, fraudulent and deceitful acts of a third party....'" *Gertler v. Goodgold*, 107 A.D.2d 481, 489–90, 487 N.Y.S.2d 565, 572 (1st Dep't) (quoting *Union Car Advertising Co. v. Collier*, 263 N.Y. 386, 401, 189 N.E. 463, 469 (1934)), *aff'd mem.*, 66 N.Y. 2d 946, 489 N.E.2d 748, 498 N.Y.S.2d 779 (1985).

"The requirements for establishing liability for interference with prospective contractual relations are more demanding than those for interference with performance of an existing contract." *Gertler*, 107 A.D.2d at 490, 487 N.Y.S.2d at 572 (citing *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191, 406 N.E.2d 445, 449, 428 N.Y.S.2d 628, 632–33 (1980)). "This tort requires proof that the defendant's sole motive was to inflict injury and that the defendant employed unlawful means to do so.... Under New York law, 'unlawful means' refers only to criminal or fraudulent conduct." *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 838 (2d Cir.1980) (applying New York law). Furthermore, there is a common law privilege to interfere with contracts or businesses when acting in one's own legitimate self interest. *Hammerhead Enterprises, Inc. v. Brezenoff*, 551 F.Supp. 1360, 1370 (S.D.N.Y.1982), *aff'd*, 707 F.2d 33 (2d Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983). Included in this

privilege is the right to threaten a lawsuit, provided it is done in good faith. *Cf. Maclaren v. B–I–W Group Inc.*, 329 F.Supp. 545, 548 (S.D.N.Y.1971) (right to threaten bona fide suit for patent infringement).

The evidence is clear that defendant did not act out of malice; nor does the record show that unlawful means were used or that defendant's sole purpose was to injure plaintiff. Letraset acted in its own legitimate self interest. It held a good faith belief that the prospective business arrangements which Daler–Rowney and Pantone were about to enter into would be a breach of the contracts between itself and Pantone; and it has proved that it was correct in that belief. Letraset's goals were legitimate and its actions were within the scope of the common law privilege. Accordingly, no cause of action for tortious interference with business relations exists as a matter of law.

*Count III—Unfair Competition*

Pantone also claims that Letraset is unfairly competing with it by seeking to prevent it from entering into license and distribution agreements with Daler–Rowney and seeking to prevent its distribution of the products in question herein.

"The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another.... Central to this notion is some element of bad faith." *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980) (citations omitted). A party misappropriates another's skill, labors, expenditures or goodwill when it sells its product through misleading the public into thinking that the product is sponsored by or derived from the other or the other's product. *See American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 662 (2d Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980); *Davis & Co. Auto Parts, Inc. v. Allied Corp.*, 651 F.Supp. 198, 203 (S.D.N.Y.1986).

The record is completely devoid of any facts supporting such a claim. No misappropriation or passing off has been pleaded or proved; nor are there any allegations

that Letraset is itself selling a product or products in any way other than that which it is permitted under the contracts between the parties. The unfair competition claim will be dismissed with prejudice as a matter of law.

### Conclusions

The restrictive covenants in Paragraph 28(2) of the Purchase Agreement were designed to protect the considerable investment of Letraset against particular possible future actions by Pantone, regardless of whether Pantone then contemplated the eventual subsequent developments. Had the second end use of numbering systems come to the fore it is inconceivable that Letraset would forego domination of the "PANTONE" mark in the commercial artist supplies field.

Letraset is entitled to a declaration that the proposed licensing of the trademark "PANTONE" for use on gouache and air brush color violates the covenants by Pantone contained in the parties' 1972 contracts.

Under the facts of this case, Pantone may not license Daler–Rowney to use the trademark "PANTONE" on gouache or air brush color. The use by Pantone itself of the trademark "PANTONE," or the entry by Pantone into any agreement with Daler–Rowney or any other person, firm or entity permitting use of the trademark "PANTONE," or any colorable imitation thereof, on or in connection with the manufacture or sale of gouache, air brush color or other products generally recognized as commercial artist supplies, is a breach of the 1972 contracts between Pantone and Letraset.

Plaintiff Pantone, Inc., its officers, directors, employees, agents and representatives, and any person with notice of the decree to be entered herein, in active concert with any of them, are to be permanently enjoined from *using* or licensing others to use the mark "PANTONE" or any colorable variation thereof

    a.  in connection with the manufacture or sale of designers gouache or air brush color, irrespective of Pantone's color specifying system coordinated therewith;

    b.  in connection with the distribution of Pantone's Coatings Color Paper other than through home decorating centers and similar outlets;

    c.  on or in connection with any products which are in direct competition with "GAM," as defined in Article I(1) of the 1972 Trademark Agreement between the parties to this suit; and

    d.  on or in connection with any products which are generally recognized as commercial artist supplies, irrespective of Pantone's color specifying system coordinated therewith.

*Relief*

The complaint is dismissed on the merits and judgment shall be entered on the counterclaim, consistent with the conclusions set forth above, in favor of defendant, with costs and disbursements. Submit judgment accordingly on notice on or before August 2, 1988, conforming to Rule 54, Fed.R.Civ.P., without recital of pleadings or the record of prior proceedings.

The foregoing shall constitute the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

So Ordered.