**200 EAST 87TH STREET ASSOCIATES,**
Plaintiff,

v.

**MTS, INC., Defendant.**

**No. 92 Civ. 2681 (RWS).**

United States District Court,
S.D. New York.

July 21, 1992.

Michael B. Kramer, New York City (Artemis Croussouloudis, of counsel), for plaintiff.

Morrison & Foerster, New York City (Kim J. Landsman, Marc Schoenfeld, of counsel), for defendant.

## OPINION

SWEET, District Judge.

This is a $32 million dollar landlord-tenant dispute involving a newly constructed building at 200 East 87th Street (the "Building"). The plaintiff, 200 East 87th Street Associates (the "Landlord"), seeks a declaratory judgment to enforce a March 17, 1989 agreement (the "Lease") between its assignor, Zemnor 87 Corp. ("Zemnor"), and defendant MTS, Inc. ("Tower") one of its tenants. By its counterclaims Tower seeks to break the Lease and to recover damages. Upon a bench trial, all prior proceedings and the findings of fact and conclusions of law set forth below, judgment will be entered enforcing the Lease and dismissing the counterclaims.

This fact-rich controversy involves the complicated relationship between a developer, his architects, his contractor and his tenants. It requires a determination of the meaning of the Lease provisions, whether or not Tower's acts constituted a waiver of its rights, and the adequacy of the Building under the terms of the Lease. Notwithstanding the skilled representation of both the Landlord and the Tenant here, the dispute has engendered the familiar emotional climate of lesser landlord-tenant disputes.

## PRIOR PROCEEDINGS, THE PLEADINGS AND THE ISSUES

This action arises out of the Lease between the Landlord and Tower[1] dated as of March 17, 1989, which was for retail space in the Building. The Building consists of 25 stories for residential, educational, commercial and assembly use. Its top three floors are used for mechanical space. The residential units begin at the eighth floor. Tower served notice on April 7, 1992 terminating the Lease based upon the conceded failure of the Landlord to obtain a Temporary Certificate of Occupancy ("TCO") by March 17, 1992 as required by the Lease.

This action was commenced by the Landlord on April 13, 1992 by the filing of a verified complaint in New York State Supreme Court, New York County (the "Complaint"). Tower removed the action to this court, under its diversity jurisdiction, on April 14, 1992. On April 22, 1992, the Landlord moved by order to show cause for a preliminary injunction on the grounds that the holder of the underlying mortgage, the Manufacturers Hanover Trust Company ("MHT"), would foreclose upon the Building as a consequence of a certain notice to cure served upon MHT by Tower on March 17, 1992 (the "Notice to Cure"). The hearing on the preliminary injunction and the trial on the merits were ordered consolidated and expedited discovery was undertaken. MHT has taken no action as yet to foreclose on its mortgage, presumably abiding the event of this decision.

The Complaint seeks a declaration that the Landlord is not in violation of any of the provisions of the Lease based upon the failure to obtain a TCO for the Building by March 17, 1992, that the notice terminating the Lease is void, that the Landlord be afforded a reasonable opportunity to cure its breach and that Tower be enjoined and restrained from terminating the Lease based upon the March 17, 1992 Notice to Cure.

Tower's Answer asserts as an affirmative defense a right to terminate based upon Landlord's failure to obtain a TCO within three years of the date of the Lease. By its Answer, Tower has also interposed counterclaims asserting that the Landlord has repudiated or breached the Lease by failing to substantially perform because: (1) the slab-to-slab height on the first and second floors does not meet the requirement of ¶ 46(4) of the Lease; (2) the square

---

1. The Lease was actually entered into by Tower and Zemnor. As of July 26, 1990, Zemnor assigned its interests in the Lease and the ground lease to the Landlord.

footage of the second floor is less than that required under ¶ 46(3) of the Lease; and (3) the service vestibule is unusable and does not conform to Exhibit A of the Lease. Tower also claims that the Landlord has breached the covenant of quiet enjoyment because the floor between the gymnasia of the Dalton School ("Dalton") and Tower's second-floor space is insufficient to prevent transmission of noise and impact sound. On its counterclaims, Tower seeks a declaration that the Lease is terminated and of no further force and effect, damages sustained as a result of the Landlord's alleged breach of the Lease and attorneys fees and costs.

By way of a Reply, the Landlord has alleged that Tower has waived and is equitably estopped from claiming a default and under the TCO requirement. The Reply also asserts that Tower is estopped from asserting the ceiling-height requirement, that the dispute as to the square footage of the space is subject to arbitration and that the cause of action for noise from the Dalton School gym is premature.

The trial before the Court took place from June 1, 1992 through June 9, 1992. Final submissions were filed on June 16, 1992.

THE FACTS

*The Parties*

The Landlord is a New York partnership, the general partners of which are Norman Segal ("Segal"), a self-styled real estate developer, and ROC–87 Corp., a New York corporation owned and controlled by The Olnick Organization.

Tower is a California corporation with its principal place of business in Sacramento, California. Tower owns and operates over seventy record stores throughout the United States and the world under the tradename Tower Records and claims distinction from its extensive offerings presented in a lively and compelling fashion. For all intents and purposes, the sole shareholder of Tower is and has been Russell Solomon.

*The Lease and its Amendment*

On or about November 1, 1988, Segal, through his wholly owned corporation Zem-

nor 87 Corp. ("Zemnor"), acquired a ground lease interest in the premises at 1531–1545 Third Avenue, New York, New York by executing a ground lease agreement with the fee owner, Ardmore Realty ("Ardmore"). In order to obtain the necessary construction financing from its lenders, Zemnor sought commercial tenants for the proposed mixed-use building which it sought to develop.

After negotiations with Dalton and the national retail chain, The Gap, Zemnor executed agreements with both Dalton and The Gap for space in the Building in early 1989. Dalton entered into an agreement to pay approximately $5 million dollars to Zemnor in exchange for a 195–year lease of the third, fourth and fifth floors of the Building. The Gap executed a Lease with Zemnor which provided for an annual rental of approximately $1 million dollars. The Gap leased approximately eight thousand square feet on the first floor and the basement level of the Building. The rent charged to The Gap was calculated solely upon the square footage of the ground floor space, having the greatest commercial space value, at the rate of $140 per square foot per year.

Negotiations between brokers for Zemnor and Tower began in late 1988 relating to the nature, size and location of the space to be leased by Tower as well as the rent. A general agreement was reached under which the Tower space was to be located at the southerly most portion of the Third Avenue side of the Building and below the space for Dalton gymnasia. Tower agreed to lease the entire second floor, and portions of the first floor, basement and sub-basement. Lawyers for both Zemnor and Tower then negotiated the terms of the Lease agreement over the next three to four months in approximately six drafts.

The Lease was a written lease agreement dated as of March 17, 1989 between Zemnor, as landlord, and Tower, as tenant. The Landlord is the assignee of all of the interests of Zemnor in and to the Lease and the ground lease covering the land on which the Building has been constructed pursuant to an agreement of lease dated as

of July 26, 1990. The term of the Lease is eighteen years at an annual base rent payable in an amount of approximately $1,131,-000. At Tower's insistence, the Lease was modified to provide for specifics of the work to be done by the Landlord relative to Tower's space. In addition, Tower requested the insertion of a provision acknowledging that Tower would be playing music in its space until midnight 365 days a year.

The Lease further provided that the Building would be constructed within three years and that rent would not commence until seven months after substantial completion of the Building. Commencement of the time to pay rent would be further deferred if the Landlord had not procured a TCO for the premises when Tower was ready to open for business.

Paragraph 59 contains the provisions relating to the commencement of the Lease. Paragraph 59(A) states in relevant part that:

The parties further agree that if Owner does not construct the Building and obtain a Temporary Certificate of Occupancy for the Building within three (3) years from the date hereof, for whatever reasons, including the Owner's decision to abandon the project, then either party may terminate this Lease by sixty days notice to the other. . . .

Paragraph 59(C) states in relevant part that:

If, at the time that Tenant is ready to open for business, the Owner has failed to obtain a Temporary Certificate of Occupancy for the commercial space in the Building (Owner's TCO), or if obtained, the Owner's TCO is lost or suspended, and if such failure, loss or suspension shall prevent Tenant from proceeding with Tenant's work, or from obtaining a TCO or sign-off relative to Tenant's work (provided that such failure, loss or suspension has not been caused by acts or failures of Tenant), then the period of seven months set forth above shall be extended by the number of days from the date of prevention of Tenant's work or delay in opening until the Tenant is notified that the Owner's TCO has been obtained or reinstated.

Paragraph 44(C) states as follows:

In the event of any act or omission of Owner which would give Tenant the right, immediately or after lapse of a period of time, to cancel or terminate this Lease, or to claim a partial or total eviction, Tenant shall not exercise such right (i) until it has given written notice of such act or omission to the holder of the first Mortgage ("Superior Mortgagee" [MHT]) and the lessor under the Ground lease ("Superior Lessor" [Ardmore]) whose name and address shall previously have been furnished to Tenant in writing, and (ii) unless such act or omission shall be one which is not capable of being remedied by Owner or the Superior Mortgagee or Superior Lessor within a reasonable period of time, until a reasonable period for remedying such act or omission shall have elapsed following the giving of such notice and following the time when the Superior Mortgagee and Superior Lessor shall have become entitled under such Superior Mortgage or Ground lease, as the case may be to remedy the same, which reasonable period shall in no event be less than the period to which Owner would be entitled under this Lease or otherwise, after similar notice to effect such remedy, provided the Superior Mortgagee or Superior Lessor shall, with due diligence, have given Tenant written notice of its intention to and shall commence and continue to remedy such act or omission, but nothing herein contained shall obligate any Superior Mortgagee or Superior Lessor to do so unless it so elects.

Paragraph 59(B) provided that Tower shall receive possession of the premises upon "substantial completion of Owner's Work set forth in Article 46." Of the "Owner's Work" enumerated in paragraph 46, several subsections are relevant here. Paragraph 46(3) provided that "the allocation of store space in the new building . . . shall have . . . approximately 11,850 square feet of second level store space . . . +/−5%" and that the overall store space "shall be substantially in accordance with the

plan attached." Under the Lease, the retail store and basement space leased by the Owner to Tower was "as more particularly described in Exhibit A, annexed hereto." Paragraph 46(4) provided that Tower's "store space shall have 13 foot ceilings (slab to slab) on the street level and the second floor level." Finally, ¶ 46(10) provided that:

(10) ... The service elevator shall be located in a receiving vestibule.... Owner shall submit shop drawings for Tenant's approval subject to subparagraph (14) hereof, prior to ordering elevators.

As defined in ¶ 59(B), "substantial completion" is:

the stage of the progress of Owner's Work which shall enable Tenant a) to hook up with the basic electrical, plumbing and condenser systems installed by Owner as part of Owner's work; b) to commence its use or occupancy of the demised premises for its normal business purposes, including commencement of Tenant's Work, without material interference by reason of the completion of unfinished details of Owner's Work ...; c) to have elevator service to all four floors of Tenant's space by the use of at least one of the elevators allocated specifically to Tenant and designated herein as part of Owner's work and d) when the demised premises are completely enclosed and weathertight.

The Tower space represents 14% of the entire space in the Building and approximately 33% of its commercial space.

Pursuant to the Lease, Zemnor was required to commence construction of the Building no later than January 1990. Because Segal's original partner "went broke," Segal was unable to commence full construction of the Building by January 1990. As a result, Tower sought to terminate the Lease. Almost immediately, negotiations ensued between Tower and Zemnor which resulted in the Amendment of Lease dated as of April 23, 1990. The Amendment gave Tower the benefit of a base annual rent of $985,000, a reduction of $145,000 annually or $2,610,000 over the life of the Lease. The Lease Amendment provided for a "break ground" date of August 15, 1990. Regrettably for Segal, the date set forth in Paragraph 59(A) was not amended accordingly.

On or about July 26, 1990, the ground lease and the Lease, as amended, were assigned to the Landlord which obtained a construction and project loan from MHT in the sum of $32 million dollars. The rental from the Lease represents approximately 40% of the sums required to carry the debt service on the MHT loan.

In recognition of the critical importance of the Lease, MHT, Ardmore and BRT Realty Trust ("BRT"), also the holder of a mortgage on the property at 1535–1545 Third Avenue and 206 East 87th Street, entered into certain Non–Disturbance and Attornment Agreements with Tower dated as of July 25 and 26, 1990 (the "Non–Disturbance Agreements"). These agreements, which are essentially identical in substance, provided, *inter alia*, that Tower would not terminate the Lease as a result of any acts or omission of the Landlord until it notified these parties and provided an opportunity to cure such act or omission. The only exception in the Non–Disturbance Agreements to this right to cure was a failure by the Landlord to commence construction on August 15, 1990, time being expressly "of the essence." No other time period in the Lease, as amended, contained a time-is-of-the-essence qualification.

*The Construction of the Building*

Segal had retained the architectural firm of Emery Roth & Sons ("Emery Roth") to do feasibility studies and early designs for the Building. While the Lease contained no reference to the basic construction material for the Building, by the spring of 1990 Emery Roth had produced preliminary drawings contemplating a concrete construction. Segal's general contractor, Marson Construction Co. ("Marson") was concerned about the cost of the project as designed by Emery Roth.

During the summer of 1990, Marson discussed the design of the Building on an informal basis with John Ciardullo ("Ciardullo"), an architect at the firm of John Ciardullo & Associates ("JCA"). Ciardullo

suggested that a change to steel construction might better accommodate the design. In September 1990, Segal replaced Emery Roth with JCA, believing that the change would result in savings in the construction as well as a better design for the Dalton gymnasia. At this time, the initial steps of construction, excavation and foundation were just about to commence. Ciardullo, a credible and impressive witness, designed the Building in three months, less than half the time the prior architects had anticipated. However, no critical path, fixed dates for performance of particular tasks, was set, leaving some ambiguity as to the time for the completion of design requirements for the Tower space.

The change of architects and construction plans created heavy time pressures on all concerned. Emery Roth's last foundation drawings showed a change and a "hold" notation on the passenger elevator in Tower's space. Because of the transition, that information either was not communicated to Ciardullo or was overlooked. As a result, the portion of the foundation for that elevator was poured and had to be ripped out and re-poured. In other instances, the foundation sub-contractor got ahead of the architect's drawings, and work had to be redone. Even under the Ciardullo design, the sub-basement, basement and first floor were to remain concrete. The only Tower floor which was to be constructed of steel was the second floor, which had a 2–inch steel deck and 3¼–inch concrete pour.

Because it could receive a $6,250 premium for each calendar day after the Building was completed prior to June 30, 1992, Marson sought to complete the Building expeditiously. However, Marson was held back in mid-October 1990 by "lack of information from [the] structural engineer." The foundation work was completed in November of 1990.

During the fall of 1990, Marson was unable to calculate the structural steel openings for Tower's escalators because Tower had not selected between two manufacturers. Therefore, when the time came to pour the pit and set the structural steel in that area, Marson made its calculations based upon the largest openings.

Marson was originally promised completed drawings of the steel design by November 15, 1990 so that it could contract with its steel suppliers. Some delay resulted, in part because the Tower space had not been fully designed, but by early January 1991 sufficient information was available to enter into a contract for the steel.

After January 14, 1991, Marson resumed at a "limited pace" while waiting for the boilers and oil tanks to be delivered a little over a week later. The structural steel did not arrive until April 15, 1991 which, according to Marson, was 103 days late.

Segal never gave the Tower lease to either his architect or his contractor. As a consequence, neither Ciardullo nor the contractor knew whether work in a tenant's space was extra work or work required by the Lease. In designing the overall Building, Ciardullo changed the Emery Roth plan for the Tower space and submitted a design to Tower's architects, Buttrick White & Burtis ("BWB"), showing 12 foot, 6 inch slab-to-slab ceilings on the street level and second floor, rather than the ceiling heights of 13 feet slab-to-slab set forth in ¶ 46(4) of the Lease or the 13 foot 8 inch second floor ceiling height represented in the Emery Roth drawings. This changed was accompanied by a change in slab thickness, from the 10–inch concrete slabs contemplated by the Emery Roth drawings, to 5¼–inch steel and concrete slabs on the first and second floors. There was no structural or physical reason that Ciardullo could not provide 13 foot slab-to-slab ceilings in his design. However, the overall height of the Building was limited by zoning, so that there was a trade-off of commercial for residential space.

Ciardullo's drawings also varied from the Emery Roth drawings as to the square footage on the second floor. The Emery Roth drawings showed 11,456 square feet on the second floor, which was within 3.3% of the 11,850 square feet called for in the Lease. Ciardullo's first drawings showed only 10,493 square feet on that floor, for a shortfall of 11.5%. In addition, the Ciardul-

lo drawings showed a change in the Tower service vestibule shown in Exhibit A to the Lease. This vestibule was to be used by Tower "to get merchandise in and ... to get garbage out." Tower desired a service vestibule large enough for one person to bring in a delivery pallet pulling a pallet jack and to store at least one pallet of merchandise being delivered to avoid the necessity of having store employees supervise every delivery as well as the risk of having delivery trucks double-parked on Third Avenue. Neither the Lease nor Exhibit A provided any dimensions or square footage for the vestibule, although the Emery Roth drawings showed a rectangular space 10 feet deep and wider than it was deep. In contrast, Ciardullo's drawings showed a service vestibule which was rectangular and approximately 9 feet by 10 feet, or 90 square feet.

As soon as he received the first set of Ciardullo's drawings for the Tower space on October 26, 1990, Theodore Burtis ("Burtis"), the BWB partner responsible for the design of the Tower space, wrote Segal to point out "areas where the work shown on the latest documents deviates from what is described in the lease, and [to] note[ ] differences between the lease and anticipated requirements of Tower Records." Among these areas was the difference in the slab thickness between the second and third floors, which caused Burtis "concern[ ] about the transmission of impact noise from the third floor gymnasium into the main Tower Records selling space." Burtis also pointed out that the Ciardullo drawings provided 11.5% less square footage on the second floor than that provided in the Lease as well as slab-to-slab ceiling heights on the first and second floors of only 12 feet, 6 inches as opposed to the 13 feet provided in the Lease. These issues were also raised by Robert F. Liner, counsel to Tower, in letters dated November 19, 1990, November 28, 1990 and December 20, 1990. In the last of these letters, Liner represented that his client did not "intend to accept the premises" under these conditions and requested a representation from Segal that he would fully comply with the terms of the Lease. Ciardullo made no changes, and Segal took no steps to accomplish any changes. However, Tower never took any action to terminate the Lease based on these deviations, and in fact indicated its intentions at all times to move ahead with the project.

In early 1991, Tower decided to abandon its escalator design. The redesign involved a reconfiguration of space, the replacement of the escalators by free floating stairs, and the installation of an additional passenger elevator which required the construction of an elevator shaft through four floors of their space. The decision to enlarge the stair required reframing of the opening for the steel. Tower sought a two-story atrium affect and the inclusion of revolving doors at the entrance. The redesign resulted in the demolition of concrete and metal deck in order to provide the penetrations as well as the demolition of masonry partitions. Moreover, changes were required to the entrance which involved the redesign of structural steel to create the atrium effect that Tower wanted. The specifics of the redesign were being developed in March and April, 1991.

In May 1991, Marson was at the point of pouring the first metal deck, which was the second floor of the Tower space. BWB instructed Marson to hold back on pouring the concrete because Tower was still considering aspects of its redesign of its space.

Marson was concerned about the expense involved in the redesign and the responsibility for the change orders and sought to have Segal resolve the matter as a condition to acquiescence to Tower's redesign. Through the attorneys for the parties, Segal obtained a letter dated May 17, 1991 from Michael Solomon, vice-president of Tower, acknowledging the request for changes in the design for the Tower Records store and stating that "[w]e acknowledge that taking these actions could have consequences in terms of the project's cost and schedule and we will work with you to make equitable adjustments." The majority of the work done relating to the redesign was done by Marson by January 1992 at a cost of $138,000.

As constructed, the slab-to-slab floor to ceiling height on the first floor is 12 feet, 6 inches, and on the second floor is 12 feet, 4 inches for most of the floor, and 12 feet, 6 inches for part of it. The structural ceiling is 5¼ inches thick and is composed of a concrete slab on a metal deck, yielding floor-to-ceiling heights of 12 feet, ¾ inch and 11 feet, 10¾ inches. Taking into account 16–inch steel beams plus one inch of fireproofing, the clear ceiling heights at the points of the beams on the first and second floors would be reduced to approximately 10 feet, 8 inches and approximately 10 feet 6 inches in some parts of the second floor.[2] Exhibit A of the Lease had anticipated beams of approximately 16–inch thickness thus yielding clear ceiling heights at the points of the beams of approximately 10 feet, 10 inches. The actual amount of space allocated to Tower on the second floor, as calculated by Tower, is now 10,600 square feet. The Landlord calculates the second floor square footage at 11,040 square feet.

The Gap lease required the Owner to provide The Gap with 100 feet of first floor street frontage, plus or minus 5%. The Gap complained that it was only given 87 feet, 11 inches of first floor street frontage. In order to give The Gap 95 feet of street frontage, the Landlord moved the service vestibule into the Tower retail space, removed 54 square feet of space from the vestibule, and changed the 9 by 10 feet vestibule into a corridor with an approximately three foot protrusion into the first floor retail space approximately four feet from the bottom of the stairs by which customers will descend from the second floor. Tower was aware of this change by at least September of 1991, as evidenced by a memorandum from Burtis to Michael Solomon dated September 27, 1991.

As built, the floor between the Dalton gymnasia and the second floor Tower retail space was changed from ten inches of concrete to just over five inches of concrete and steel deck, comprising 3¼ inches of lightweight concrete over a 2–inch metal deck.

With respect to this change, Dalton hired the engineering firm of Shen Milsom & Wilke to evaluate the potential the transmission of "excessive impact noise," which is noise produced mainly by running footfall and ball-bouncing activities, to the retail spaces directly below. Dalton's acoustical expert evaluated the impact noise problem hypothetically, considering three different floor-types: (a) the actual floor built by the Owner, consisting of lightweight concrete of approximately 41 lb/sq. ft. density; (b) a floor similar to but somewhat thinner than the one originally contemplated when the Building was to be of concrete construction, consisting of a reinforced concrete slab weighing approximately 90 lb./sq. ft. density (or about 8 inches thick); and (c) a floor that had the same mass as the original floor but a different construction. The expert concluded that with the 8–inch thick concrete floor, the transmission of impact noise "would be slightly audible but not distracting or disruptive." With the lightweight 3¼–inch concrete floor on a 2–inch metal deck actually built, however, the transmission of impact noise would be "perceived subjectively" as more than twice as loud as with the 8–inch thick concrete slab. Dalton has planned to use the best gymnasium floor available to provide the maximum attenuation of impact noise.

The Landlord retained an expert, Cerami and Associates, Inc., which reported to the Owner in March 1991:

We are in agreement with the Dalton School consultant (Shen–Milsom–Wilke), that the existing slab is too lightweight, and that some impacts will be perceptible in the retail space below.... Notwithstanding the above, we must express a doubt that a real problem will occur, since it will be necessary for the gymnasium to be in use at a time of acoustical

---

**2.** Although Burtis testified that a "hung ceiling" would reduce the ceiling heights even further, it was not established precisely how thick this construction would be. Furthermore, Tower did not establish that such a construction would not have been necessary under the construction contemplated by Exhibit A.

"sensitivity" in the retail space. We have to expect that a record shop is relatively "insensitive," since the ambience includes music played at a reasonable level. Thus, we believe that the potential for a real problem is certainly not great.... [I]n the event of a real problem occurring post construction, little or nothing could be done to relieve the situation. The usability of the affected space would potentially be restricted to the detriment of revenue production.

However, no tests have been conducted at the Building to measure the actual impact noise originating in the Dalton gymnasia or the extent to which it is perceived in the Tower space under normal operating conditions.

On January 22, 1992, the Landlord sent a letter to Tower stating that the Building would be substantially complete as of January 30, 1992 to permit Tower to work on its space. On January 30, 1992, Tower rejected the Landlord's claim of substantial completion as of January 30, 1992.

THE ISSUANCE OF THE TCO

As set forth above, the Lease required the Landlord to obtain "the Temporary Certificate for the Building" by March 17, 1992. A TCO is issued after inspection by the Buildings Department to determine if a building has been constructed in accordance with plans filed and approved by the Department. A TCO can be obtained for any portion of the building meeting this criterion.

The construction of the Building stayed well ahead of Buildings Department approvals until at least February 1992. After the excavation permit was issued, and for most of the time the Building was under construction, the Owner had approval only to build up to the 6th story. An application for Buildings Department approval for the plans for all 25 stories of the Building was filed in May 1991. The approval of the Building's plan was not issued until February 14, 1992, however, because the Landlord could not obtain approval for a building beyond 17 stories without approvals under the City's Quality Housing Program and what is termed Inclusionary Zoning.

The Buildings Department's objection to the application on that basis was removed on November 26, 1991.

Segal wrote to Tower's lawyer on October 1, 1991 that "[w]e anticipate ... that an initial TCO for the residential space will be obtained by February 1, 1992."

On October 16, 1991 Tower's counsel sent a certified letter to Segal outlining the sequence of past discussions and differences specifying six enumerated issues, floor area, zoning, construction costs, schedule, the Dalton gym and piping. The letter concluded with a warning that Tower "expects the Owner to timely comply with all of its obligations."

Tower never mentioned to plaintiff the need to obtain the TCO by March 17, 1992, nor was the date for obtaining the TCO mentioned in any of the correspondence between the parties. However, an expediter on behalf of Tower was monitoring the Buildings Department in order to ascertain if the Landlord filed for a TCO. The only reference to a TCO between the parties is on page 4 of the October 16 letter and states:

[s]o to assist in the process of obtaining a TCO, please advise us of any Tenant's work needed to be completed so to enable you to obtain the TCO.

Discussions among Tower architects, lawyers and officers late in 1991 indicated awareness of the Landlord's March 17, 1992 deadline for obtaining a TCO. A memorandum of December 23, 1991 from Burtis entitled "Outstanding Lease and Construction Issues" refers to the "March 17 scenario."

The process of applying for a TCO for the residential portion began on February 24, 1992, when the contractor called a meeting to discuss the remaining tasks required to be completed before the Owner could apply for the TCO. The agenda prepared for that meeting indicated 14 remaining tasks, one of which involved the commercial tenants, and the filing of an amendment to reflect the plans as-built throughout the Building.

On March 17, 1992, Tower sent a document bearing the title "Notice to Cure," to MHT, BRT and Ardmore stating that Zemnor was in default of paragraph 59 of the Lease based upon the alleged failure to obtain a TCO within three years of the date of the Lease. The notice stated that Tower acknowledged a 30–day period to cure the alleged default pursuant to the Non–Disturbance Agreements.

By letter dated March 23, 1992, MHT notified Tower that it was in receipt of the Notice to Cure and that it intended to effectuate a cure in accordance with the terms of the Non–Disturbance Agreement. By letter dated April 7, 1992, Tower advised MHT, BRT and Ardmore that the Notice to Cure, dated March 17, 1992, was not intended to acknowledge, nor did it contain, any right to cure the default in obtaining a TCO as the default was not curable.

By letter dated April 7, 1992, Tower sent a notice to Zemnor, informing it that the Landlord had failed to obtain a TCO within three years and that, pursuant to Article 59 of the Lease, Tower was therefore terminating the Lease effective 60 days from the notice.

Reports on March 30 and April 8, 1992 detailed the work to be completed before the issuance of a TCO, and noted that Segal had not cleared up violations issued before Marson took over as contractor.

The April 1992 application to the Buildings Department for a TCO, showing "as-planned" work in the Tower Records space and "as-built" conditions in the rest of the Building, engendered three objections relating to the Tower space. The first objection concerned a requirement that Tower's stairs be enclosed in 2–hour fire-rated sheetrock rather than glass. The Owner had the option of seeking a reconsideration of this objection. A request for reconsideration was signed by Ciardullo, and a meeting was scheduled with Deputy Borough Commissioner Chandler, but the Owner did not seek the reconsideration. Instead, Ciardullo revised the drawings to include the fire-rated enclosure.

Objections numbered 2 and 3 concerned the front doors of the Tower space. Under objection number 2, the configuration of the entrance was considered not to comply with laws concerning handicapped access. Ciardullo redrew the entrance to show only swinging doors. Objection number 3 was based on an incorrect calculation of the width required for the entryway doors, and it was removed.

The first inspection by the Buildings Department for purposes of obtaining a TCO was conducted on May 8, 1992. The Buildings Department inspector determined that the Building was not ready for a TCO based on 17 objections. These objections were satisfied and a TCO issued on June 1, 1992.

The TCO covered the residential floors of the Building on which final plans have been filed and construction completed in accordance with the plans. It does not cover the Tower space, on which work has been suspended.

CONCLUSIONS OF LAW

A. *The Landlord has Cured its Failure to Obtain a Building TCO by March 17, 1992*

In a contract action, the court's general objective should be to give effect to the intentions of the parties in entering into an agreement, *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990) (citing *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 171–72, 350 N.Y.S.2d 895, 898–99, 305 N.E.2d 907, 909–10 (1973); *Morlee Sales Corp. v. Manufacturers Trust Co.*, 9 N.Y.2d 16, 19, 210 N.Y.S.2d 516, 518, 172 N.E.2d 280, 282 (1961)), in such a way as to produce a reasonable result. *Omath Holding Co. v. New York*, 149 A.D.2d 179, 185, 545 N.Y.S.2d 557, 560 (1st Dep't 1989). Under New York law, the application of which is not disputed here, where a contract is unambiguous on its face, its proper construction is a matter of law. *Id.* In determining whether an ambiguity exists, the court must look to the document as a whole rather than at sentences or clauses in isolation. *See id.* at 889 (citing *Breed v. Insurance Co. of N. Am.*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d

1280, 1282 (1978)); *Pantone, Inc. v. Esselte Letraset, Ltd.,* 691 F.Supp. 768, 771 (S.D.N.Y.1988), *aff'd,* 878 F.2d 601 (2d Cir. 1989).

■ Tower argues that ¶ 59(A) unambiguously states a condition subsequent, which, having not been satisfied, gives rise as a matter of law to an absolute right to cancel the Lease on sixty days' notice. As distinguished from a covenant, which is "a promise to do, or to forbear from doing, a specific act or acts....[,] a condition subsequent is one by the failure or nonperformance of which an estate already vested may be defeated." 74 N.Y.Jur.2d §§ 81–82, at 119–20 (1989). According to Tower, whereas the failure to perform a covenant results in a default that may be amenable to cure, the failure of a condition subsequent is not curable.

Were the Lease indeed unambiguous as to whether failure to obtain a building TCO by March 17, 1992 was an incurable condition, Tower may have proved a valid claim for rescission of the Lease. In *Abrams v. Thompson,* 251 N.Y. 79, 167 N.E. 178 (1929), the New York Court of Appeals interpreted a land-sale contract that provided the purchaser with the right to elect rescission of the contract if the seller failed to obtain mortgage releases from third parties within one year of the date of the contract. Upon the failure of the seller to obtain these releases within one year, the court upheld the purchaser's right to cancel, stating:

> We read this contract as giving the plaintiff an absolute right to rescission. This was the thing contracted and stipulated for; the title was closed with this inducement and understanding.

*Id.* at 85–86, 167 N.E. 178. *See also Waskewich v. Redding,* 97 A.D.2d 758, 759, 468 N.Y.S.2d 178, 179 (2d Dep't 1983) (provision explicitly conditioning contract upon purchaser's obtaining mortgage within 30 days); *Med.-Guy Realty Corp. v. Amerada Hess Corp.,* 69 A.D.2d 812, 415 N.Y.S.2d 54 (2d Dep't 1979) (lease provision giving parties right to cancel lease if governmental approvals not obtained by date certain satisfied by notice of termination); *Guilford Dev. Corp. v. McCrory Corp.,* 23 A.D.2d 751, 752, 259 N.Y.S.2d 41, 42 (1st Dep't) (provision that tenant could cancel lease if landlord had not procured bona fide leases of store premises before date certain gives tenant absolute power to cancel if landlord fails to comply with condition), *aff'd,* 16 N.Y.2d 938, 264 N.Y.S.2d 924, 212 N.E.2d 441 (1965).

Nevertheless, the Lease as a whole is ambiguous as to the inflexibility of the TCO deadline, thus necessitating consideration of the intent of the parties as to the curability of a failure to meet the March 17, 1992 deadline. Specifically, uncertainty as to the intended curability of the TCO deadline is created by the phrasing of ¶ 59(A), the language of ¶¶ 59(C) and 44(C) and the conduct of the parties.[3] In reading the Lease, it is to be remembered that "[i]f a provision is so phrased as to make it doubtful whether it is a covenant or a condition, the courts will, as a general rule, construe it as a covenant to avoid a forfeiture." 74 N.Y.Jur.2d § 82, at 120.

Paragraph 44(C) provides in relevant part that:

> In the event of *any* act or omission of [the Landlord] which would give [Tower] the right, immediately or after lapse of a period of time, to cancel or terminate this Lease ... [Tower] shall not exercise such right (i) until it has given written notice ... to [MHT] and [Ardmore] ... and (ii) unless such act or omission shall be one which is not capable of being remedied by [the Landlord] or [MHT or Ardmore] within a reasonable period of time, *until*

---

3. Given that the document itself and the parties' conduct are sufficiently demonstrative of the intent of the parties as to the curability of a failure to meet the March 17, 1992 deadline, it is unnecessary to turn to "principles of last resort" such as the rule that a contract may be construed adversely to the party that drafted it. *See, e.g., Record Club of America, Inc. v. United Artists Records, Inc.,* 890 F.2d 1264, 1271 (2d Cir.1989); 3 *Corbin on Contracts* § 559, at 262 (1960 ed.). In any event, application of this principle would serve no purpose since the drafting of the Lease was a collaborative effort between skilled counsel for both parties. *See Atlanta Ctr. Ltd. v. Hilton Hotels Corp.,* 848 F.2d 146, 148 n. 5 (11th Cir.1988).

*a reasonable period for remedying such act or omission shall have elapsed following the giving of such notice ... which reasonable period shall in no event be less than the period to which Owner would be entitled under this Lease or otherwise, after similar notice....*

Landlord Exh. 2 at 6–7 (emphasis added). Paragraph 59(C) provides in pertinent part that the period of free rent will be extended beyond seven months of delivery of possession of the space to Tower if a TCO has not obtained for the commercial space at that time. Landlord Exh. 13 at 3 (emphasis added). The language of these paragraphs negates Tower's assertion that obtaining a building TCO by March 17, 1992 was intended to be an incurable condition.

First, as found above, only one kind of TCO can be obtained, namely, a building TCO covering particular areas. Thus, by providing a rent-abatement remedy for the Landlord's failure to obtain a TCO, ¶ 59(C) directly contradicts Tower's characterization of March 17, 1992 as a "drop-dead," unremediable date for obtaining a TCO. Second, ¶ 44(C) explicitly states the parties' intention that *"any* act or omission" by the Landlord that would give Tower the right to terminate shall be treated as a curable default, provided it is capable of being remedied by the Landlord, MHT or Ardmore within a "reasonable period of time." As an omission that gives rise to a right to terminate the Lease, the Landlord's failure to obtain a TCO by March 17, 1992 is thus a curable default under ¶ 44(C)'s catch-all "any."

Tower maintains that ¶ 44(C) is of no effect that respect to the March 17, 1992 TCO requirement because the specification of a date certain by which the TCO was to be obtained renders the failure to do so incapable of being cured. This contention is undermined, however, by the Lease's failure to provide that "time is of the essence" in the performance of this term. In an equity action,[4]

time of performance will not be considered of the essence of the contract unless it affirmatively appears that the parties regarded it as a material consideration.... "The mere insertion in the contract of a day of its completion does not make such time the essence of the contract, and it will not be implied as essential except where the subject of the sale has a fluctuating value, or where the object of the contract is a commercial enterprise, or the delay in completion would involve one of the parties in a serious loss."

*Lusker v. Tannen,* 90 A.D.2d 118, 124, 456 N.Y.S.2d 354, 357 (1st Dep't 1982) (citations omitted); *compare, e.g., Sparks v. Stich,* 135 A.D.2d 989, 991, 522 N.Y.S.2d 707, 709 (3d Dep't 1987) (in action for breach of contract, "[w]here a definite time of performance is specified in a contract, time is of the essence unless the circumstances affirmatively indicate a contrary intent."). Moreover, the inclusion of a "time-is-of-the-essence" qualification with respect to the "break ground" date in the Amendment of Lease takes considerable force out of Tower's suggestion that no such language was necessary to make the date for obtaining a TCO "of the essence."

Tower's conduct with respect to the March 17, 1992 deadline is further evidence that it intended a failure to obtain a TCO by that date to be a curable default. *See TSS–Seedman's Inc. v. Elota Realty Co.,* 134 A.D.2d 492, 493–94, 521 N.Y.S.2d 277, 278 (2d Dep't 1987) (right to cure may arise from conduct of parties), *aff'd,* 72 N.Y.2d 1024, 534 N.Y.S.2d 925, 531 N.E.2d 646 (1988). In its Notice to Cure served on MHT as of March 18, 1992, Tower stated that "pursuant to paragraph 2 of a certain Non–Disturbance and Attornment Agreement dated July 25, 1990, ... *you may cure such default* [the Landlord's failure to obtain a TCO by March 17, 1992] within thirty (30) days from the date of delivery of this notice to you...." This notice thus affirmatively demonstrates that Tower viewed this failure as curable, even in the

---

4. Both the Landlord's action for declaratory judgment and Tower's counterclaim for rescission based on ¶ 59(A) sound in equity.

absence of an explicit cure provision in ¶ 59(A). *Cf. Mann Theatres Corp. v. Mid–Island Shopping Plaza Co.*, 94 A.D.2d 466, 475, 464 N.Y.S.2d 793, 800 (2d Dep't 1983) ("while it is true that the lease contains no provision for cure of a ¶ 11 violation, a cure period was created when the landlord's notice fixed a time to cure and the tenancy interests adopted it"), *aff'd*, 62 N.Y.2d 930, 479 N.Y.S.2d 213, 468 N.E.2d 51 (1984).

While ¶ 44(C) and the Notice to Cure are directed expressly to MHT, Ardmore and BRT, ¶ 44(C) also implies an intent by the parties that the Landlord have a right to cure its failure to obtain a TCO by the appointed date. Such an intent can be inferred because the parameters of the right held by MHT, Ardmore and BRT are derivative of the Landlord's right to cure. For example, ¶ 44(C) provides that Tower will provide an opportunity to cure any act or omission "which is not capable of being remedied by *Owner* ..." and that the "reasonable period for remedying such act ... shall in no event be less than the period to which [the Landlord] would be entitled under this Lease...."

■ Having concluded that the parties intended the Landlord to have a right to cure its failure to obtain a TCO by March 17, 1992 within a reasonable period, it must now be determined what that "reasonable period" was intended to be.

Paragraph 59(A) provides that "if the [Landlord] does not construct the Building and obtain a Temporary Certificate of Occupancy for the Building within three (3) years from the date hereof, for whatever reason, including the [Landlord's] decision to abandon the project, then either party may terminate this Lease by sixty (60) days notice to the other." It further provides that "[i]f [the Landlord], prior to three (3) years from the date hereof, decides to abandon the project or not to construct the Building and abandons the Ground Lease, then [the Landlord] shall notify [Tower] in writing of such decision and this Lease shall automatically terminate...." The second sentence thus distinguishes one reason for termination—the Landlord's decision to abandon the project—from the others, "whatever" they may be. Whereas termination is automatic in the former case, 60 days' notice is required in the latter.

The intended purpose of the 60–day notice provision is unclear. Tower suggests that the provision "simply gives the parties advance notice so that preparations for the actual termination date can be made. In the case of the Owner, for instance, that would mean the opportunity to find a new tenant during the sixty days, in which case there need be no interruption in rent payments." Tower Post–Trial Brief at 30. However, not only was there no evidence at trial establishing that this was the intention of the parties in adopting the 60–day notice provision, but the Lease as a whole also negates this conclusion. The suggestion that the notice period exists to give the Landlord time to find a new tenant to avoid loss of rent is untenable in light of ¶ 59(C), which provides that Tower's obligation to pay rent does not even commence until at least seven months after Tower receives possession of the premises. Absent any explanation of this period's purpose, reading this provision *in pari materia* with ¶ 44(C), it is reasonable to conclude that the parties intended to treat this period as the "reasonable" cure period. *See Wuertz v. Cowne*, 65 A.D.2d 528, 528–29, 409 N.Y.S.2d 232, 233 (1st Dep't 1978) (where no curing period provided in lease cure period was time between landlord's notice of termination and it effective date). Because the Landlord obtained the building TCO on June 1, 1992, within 60 days of Tower's April 7, 1992 notice of termination, Tower may not terminate the Lease based on the Landlord's failure to obtain the TCO by March 17, 1992.

**B.** *Tower has not Waived and is not Estopped From Asserting its Right to Claim a Default Under ¶ 59(A)*

Because the Landlord cured its default under ¶ 59(A), thus precluding termination on this ground, it is unnecessary to consider its affirmative defense that Tower either waived or is estopped from asserting its right to claim default under ¶ 59(A) by vir-

tue of Burtis's May 17, 1991 letter to Segal. In any event, the facts do not support the Landlord's assertion of waiver or estoppel.

Burtis wrote the May 17, 1991 letter in response to concern by Segal and Marson about certain design changes requested by Tower in early 1991. In late April 1991, Burtis had informed Segal that Tower wanted to change from escalators to stairways as the principal means of going from the ground floor to the cellar and second floor selling spaces. In the course of discussing this change with Segal, Tower also requested that construction of the passenger elevator be put on hold. At Marson's insistence, on May 15, 1991 Segal requested that Burtis provide a letter accepting on Tower's behalf the financial responsibility for required work incident to these design changes. Tower sent the letter on May 17, 1991. The letter states in full:

Due to changes in the design for the Tower Records store at 200 East 87th Street, we request that you take the following actions:

1. Do not pour concrete at the areas in the southwest quadrant of the store as shown in drawing SK–120 provided by Buttrick White & Burtis.

2. Suspend all work on fabricating and installing the passenger elevator at the rear of the ground floor space.

We acknowledge that taking these actions could have consequences in terms of the project's cost and schedule, and we will work with you to make equitable adjustments.

The last sentence of this letter supplies the putative ammunition for the Landlord's waiver and estoppel arguments.

■ While waiver may be express or implied, see GDJS Corp. v. 917 Props., Inc., 99 A.D.2d 998, 999, 473 N.Y.S.2d 453, 455 (1st Dep't 1984) (waiver may be implied where party's conduct inconsistent with intent to enforce its rights); T.G.I. East Coast Constr. Corp. v. Fireman's Fund Ins. Co., 600 F.Supp. 178, 181 (S.D.N.Y. 1985) (contractor waived subcontractor's bonding requirement by knowingly permitting subcontractor to proceed with work unbonded), the intent to waive "must be

clearly established and cannot be inferred from doubtful or equivocal acts or language, and the burden of proof is on the person claiming the waiver of the right." East 56th Plaza, Inc. v. Abrams, 91 A.D.2d 1129, 1130, 458 N.Y.S.2d 953, 955 (3d Dep't 1983); Westinghouse Elec. Corp. v. New York City Transit Auth., 735 F.Supp. 1205, 1225 (S.D.N.Y.1990) (intention to waive must be clear and unambiguous and "should not be lightly presumed").

■ Neither the May 17, 1991 letter nor any conduct by Tower constitutes the clear and unambiguous expression of intent necessary to act as a waiver of Tower's right to assert the March 17, 1992 deadline. The letter dealt with two very specific design changes and nowhere raised the subject of the building TCO. It is undisputed that that subject never arose during the discussions leading up to the writing of the letter. While the letter does acknowledge that the requested changes may cause delay in the "project" and represents that Tower would "work with you to make equitable adjustments," presumably including schedules, this statement is simply too vague and ambiguous to effect a waiver of the March 17, 1992 deadline. For instance, the "project" referred to could very well be the work on Tower's own space rather than the Building as a whole, and "equitable adjustments" could refer to any number of things wholly exclusive of the TCO deadline. It is particularly implausible to imply any intent to waive the TCO deadline into this ambiguous phrase since the requested changes would have no effect on the construction of the Building as a whole and thus on the ability of the Landlord to obtain a building TCO.

■ The Landlord also asserts that Tower waived its right to assert the deadline by its conduct by (1) failing to raise the deadline with the Landlord or to insist on compliance after it became apparent that the Landlord would not obtain the TCO by March 17, 1992 and (2) continuing to submit plans and design changes for its space. As for the first contention, this conduct does

not constitute a waiver as Tower was under no obligation to remind the Landlord constantly of its obligations under the Lease. Likewise, the conduct at issue in the second contention cannot be construed to effect a waiver because the changes requested by Tower either had no effect on the ability of the Landlord to obtain the TCO or did not cause the delay in applying for the TCO. If anything, Tower's conduct indicates that it understood the TCO deadline to be in effect. By letter of October 16, 1991 to Segal, for instance, Robert Liner raised the subject of the TCO and stated that Tower "reserves any and all rights under the Lease, and expects the [Landlord] to timely comply with all of is obligations."

■ The Landlord's estoppel argument is also without merit. Though the parties disagree as to whether the appropriate doctrine to be applied is equitable estoppel or promissory estoppel, this distinction is without importance here because the Landlord has failed to establish reliance, an element of both types of estoppel. *See, e.g., Ripple's of Clearview, Inc. v. Le Havre Assocs.*, 88 A.D.2d 120, 122–23, 452 N.Y.S.2d 447, 449 (2d Dep't 1982) (elements of promissory estoppel are: clear and unambiguous promise; reasonable and foreseeable reliance by the party to whom promise made; and injury sustained by party asserting estoppel by reason of his reliance); *Central Fed. Sav. FSB v. Laurels Sullivan County Estates Corp.*, 145 A.D.2d 1, 6, 537 N.Y.S.2d 642, 644–45 (2d Dep't 1989) (to prove equitable estoppel, party invoking doctrine must show that it detrimentally relied on misrepresentation or conduct "in excusable ignorance of the true facts").

The facts at trial fail to establish that the Landlord relied on any representation, omission or conduct by Tower in delaying its application for a building TCO. To the contrary, Segal's October 1, 1991 letter to Tower's attorney, written a good four and one-half months after the supposedly crucial May 17, 1991 letter, amply demonstrates the *absence* of any such reliance. That letter states that "[w]e anticipate ... that an initial TCO for the residential space will be obtained by February 1, 1992," one and one-half months ahead of the contractual deadline.

Neither does Tower's continued submission of plans and drawings reflecting changes to its space effect an estoppel. The proof at trial established that it was not any act of Tower that caused the delay in filing the TCO application, but the Landlord's own actions in failing to obtain a construction loan until the end of July 1990 and the delay of the execution of necessary work, both relating to and independent of Tower's changes. It was not necessary for the Landlord to submit Tower's plans to the Building Department to obtain a building TCO because the Landlord did not have to get a TCO covering the commercial space by March 17, 1992, just for the Building. Thus, it was of no consequence to the TCO that Tower did not submit its final plans to the Landlord until late January 1992.

### C. Tower has not Established that the Landlord Repudiated the Lease

■ As an affirmative defense and counterclaim, Tower asserts that the Landlord has anticipatorily breached the Lease by failing to give Tower "possession of the demised premises for the purpose of construction of Tenant's Work upon substantial completion of Owner's Work set forth in Article 46." Lease ¶ 59(B). Specifically, Tower contends that the Landlord breached the Lease by (1) constructing first- and second-floor ceiling heights of less than 13 feet slab to slab; (2) failing to construct second floor space of approximately 11,850 square feet +/–5%; (3) failing to construct a service vestibule "substantially in accordance with the plans attached [at Exhibit A];" and (4) making inevitable the transmission of impact noise from the Dalton gymnasium to the second-floor selling space in breach of the covenant of quiet enjoyment.[5] Tower argues that the Land-

---

**5.** In its Post–Trial Brief Tower also asserts that the Landlord has breached ¶ 64(A) of the Lease.

However, as this claim has never been made a

lord has breached or repudiated the Lease because it is now impossible for the Landlord to perform its contractual obligations.

### 1. Tower is Estopped from Asserting Breach on these Grounds

Tower has been informed about the ceiling-height, square-footage and potential noise situations since October of 1990 when Burtis received Ciardullo's initial drawings. Similarly, it has known about the changes in the service vestibule since at least September of 1991. Despite voicing some dissatisfaction about variations from the Lease, however, Tower has never given the Landlord any indication that it would not proceed with the project on this basis. Thus, the Landlord has constructed the Building, including many customized alterations requested by Tower, in reliance on Tower's apparent willingness to go forward on the basis of the Ciardullo plans.

Tower's conduct thus clearly manifested an acceptance of these conditions, upon which the Landlord relied to its detriment in constructing the Building. *See Central Fed. Sav.*, 145 A.D.2d at 6, 537 N.Y.S.2d at 644–45. Tower is therefore estopped from asserting a defense of anticipatory breach on these grounds.

### 2. The Proof Does not Support a Finding of Anticipatory Repudiation by the Landlord

 Even if Tower were not estopped from asserting an anticipatory breach on the grounds claimed, the proof does not support this counterclaim. As articulated by the New York State Court of Appeals:

The doctrine of anticipatory breach is applicable to bilateral contracts which contemplate some future performance by the nonbreaching party. Pursuant to this doctrine, a wrongful repudiation of the contract by one party before the time for performance entitles the nonrepudiating party to immediately claim damages for a total breach.... [T]he doctrine relieves the repudiating party of its obligation of future performance and entitles that party to recover the present

part of the pleadings in this case, it is not

value of its damages from the repudiating party's breach of the total contract.

*American List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 44, 550 N.Y.S.2d 590, 593–94, 549 N.E.2d 1161, 1164–65 (1989) (citing *Long Island R.R. Co. v. Northville Indus. Corp.*, 41 N.Y.2d 455, 463–64, 393 N.Y.S.2d 925, 930, 362 N.E.2d 558, 563 (1977)). A party repudiates the contract where it manifests an intention not to perform a contractual duty, either by words or by conduct. Where a "promisor so conducts himself as to make the substantial performance of his promise impossible, this is a repudiation of his promise and has the same legal effect as would a repudiation in words." 4 *Corbin on Contracts* § 984, at 949 (1951 ed.).

The criteria for substantial completion are set forth in Paragraph 59(B) of the Lease:

Tenant shall receive possession of the demised premises for the purpose of construction of Tenant's Work upon substantial completion of Owner's Work set forth in Article 46. The terms "substantial completion" shall be deemed to mean that the stage of the progress of Owner's Work which shall enable Tenant 1) to hook up with the basic electrical, plumbing and condenser systems installed by Owner as part of Owner's Work; b) to commence its use or occupancy of the demised premises for its normal business purposes, including commencement of Tenant's Work, without material interference by reason of the completion of unfinished details of Owner's Work, (provided the completion of same does not interfere with Tenant's construction and/or operation of its business, interfere. with, block or obstruct store entrances or exists, freight areas, Tenant's windows or signs) or of such additional construction as the case may be; c) to have elevator service to all four floors of Tenant's space by the use of at least one of the elevators allocated specifically to Tenant and designated herein as part of Owner's Work and d) when the demised

properly before the court.

premises are completely enclosed weathertight.

The Landlord notified Tower on January 23, 1992 that its space was substantially complete. By letter dated January 30, 1992, Tower rejected January 30, 1992 as the date of substantial completion based upon:

1. The Owner's continued failure to demonstrate that the demised premises are zoned for retail use as required by the Lease.

2. The Owner's failure to construct and deliver the premises as required by the Lease.

3. The Owner's failure to comply with the terms of substantial completion as defined in the Lease.

4. The Owner's failure to respond to our letter of December 27, 1991 [quoting the letter of Robert F. Liner dated January 30, 1992].

Items 1 and 4 are not in issue here.

*The Landlord Substantially Complied with ¶ 46(4)*

Paragraph 46(4) provides that the "store space shall have 13 foot ceilings (slab to slab) on the street level and the second floor level...." Tower asserts that the Landlord has breached the Lease because the as-built ceiling heights on these floors is 12 feet, 6 inches slab to slab and, in some places on the second floor, 12 feet, 4 inches slab to slab.

Measuring a height from "slab to slab" means measuring from the top surface of one floor to the top surface of the floor above. The actual height from floor to ceiling is the slab-to-slab height reduced by the thickness of whatever structure separates the floors and any hung ceiling below that structure. The Lease anticipated a concrete construction, in which concrete slabs approximately 10 inches thick would be used for the street level and second floor. Accounting for the thickness of these slabs, therefore, the ceiling heights on the first and second floors would have been 12 feet, 2 inches.

■ Despite the 6 to 8 inch differential between the anticipated slab-to-slab ceiling height and the as-built slab-to-slab ceiling height on the first and second floors, the effect on the floor-to-ceiling height is insubstantial. The structural ceiling contained in the present steel construction is 5¼ inches of concrete and metal deck. Thus, the floor-to-ceiling height is 12 feet, ¾ inch in most places on the street level and second floor and 12 feet, ¼ inch in some places on the second floor. In actuality, then, the as-built floor-to-ceiling height varies from that anticipated by the Lease and depicted in the Emery Roth drawings by only one and one-quarter to one and three-quarters of an inch. At the point of the beams, there is a differential of approximately two to four inches. I conclude that this is a *de minimis* differential which does not render substantial performance of the contract objectively impossible.

*Square Footage is Subject to Arbitration*

Paragraph 46(3) of the Lease requires the Landlord to provide Tower with "approximately 11,850 square feet of second level store space, all +/−5% and such space shall be in accordance with the plan attached [at Exhibit A]." The Emery Roth drawings for the Building showed 11,456 square feet for the second floor, which was within 3.3% of the 11,850 square feet called for in the Lease. The first drawings by Ciardullo showed only 10,493 square feet on the second floor, a shortfall of 11.5%. The actual amount of space allocated to Tower on the second floor is now 10,600 square feet, which is 10.5% less than that called for in ¶ 46(3). Tower claims that the Landlord's failure to provide it with the second-floor square footage provided in the Lease amounts to an actual eviction that suspends Tower's obligation to pay rent.

Paragraph 61(B) of the Lease precludes Tower from litigating the square footage issue. That paragraph provides in relevant part that "[i]n the event the parties cannot agree upon the 'square footage of store space' then the determination thereof shall be submitted to arbitration before the American Arbitration Association in the City of New York...." This provision is

applicable to the present dispute over the square footage of the second floor.[6] However, Tower argues that the Landlord has waived its right to invoke arbitration by fully litigating the square footage issue without ever making a motion to compel arbitration.

 Under New York law, although "[n]ot every foray into the courthouse effects a waiver of the right to arbitrate," *Sherrill v. Grayco Builders*, 64 N.Y.2d 261, 273, 486 N.Y.S.2d 159, 163, 475 N.E.2d 772, 776 (1985), a contractual right to arbitrate may be waived or abandoned if the party invoking arbitration "manifest[s] a preference 'clearly inconsistent with [his] later claim that the parties were obligated to settle their differences by arbitration." *Id.* (citation omitted). A manifestation of such intent may be found where that party affirmatively seeks the benefits of litigation, or, in the case of a defendant, "affirmatively accept[s] the judicial forum." *See id.* at 272, 486 N.Y.S. at 164, 475 N.E.2d at 777; *De Sapio v. Kohlmeyer*, 35 N.Y.2d 402, 405, 362 N.Y.S.2d 843, 846, 321 N.E.2d 770, 772 (1974); *Riggi v. Wade Lupe Constr. Co.*, 176 A.D.2d 1177, 575 N.Y.S.2d 613, 615 (3d Dep't 1991). "Affirmative acceptance of the judicial forum" giving rise to a forfeiture of the right to arbitrate has been found where the party seeking arbitration has aggressively engaged in litiga-

tion, whether in the form of pretrial motions or discovery, for an extensive period of time prior to making a demand for arbitration. *See, e.g.*, *Sherrill*, 64 N.Y.2d at 270–72, 486 N.Y.S.2d at 162–64, 475 N.E.2d at 774–776; (defendant actively participated in litigation for over three years prior to making an arbitration demand, during which time extensive discovery took place, and continued litigative efforts after making demand); *Nishio v. E.F. Hutton & Co.*, 168 A.D.2d 224, 224, 562 N.Y.S.2d 112 (1st Dep't 1990) (defendant waited over one year to seek a stay during which time he interposed answer with counterclaims and sought discovery).[7] Contesting the merits through the judicial process has been held to be an affirmative acceptance that waives a right to a later stay of the action. *See De Sapio*, 35 N.Y.2d at 405, 362 N.Y.S.2d at 846, 321 N.E.2d at 772.

 The Landlord did participate in discovery regarding the square footage issue and did defend against Tower's square footage claims at trial. Nevertheless, the procedural posture and expedited nature of this case distinguish it from those in which a waiver has been found. This case was originally brought by the Landlord as a declaratory judgment action relating solely to Tower's termination of the Lease pursuant to ¶ 59(A)'s TCO requirement. The square footage issue did not come up until

---

**6.** Tower argues that ¶ 61(B) applies only to disputes over the *overall* square footage of the Tower space and not to disputes, such as this one, over the square footage of individual floors. However, ¶ 61(B) provides no basis for such an interpretation. The term "square footage of store space" is defined in that paragraph to include "square footage on ground floor, second floor, basement and sub-basement levels." Were Tower's interpretation of this paragraph to be accepted, one would have to rewrite that definition to state "square footage of store space means the *total* of the square footage on he ground floor, second floor, basement and sub-basement levels."

**7.** Under federal law, not applicable here, there is a strong presumption in favor of arbitration and waiver of arbitration " 'is not to be lightly inferred.' " *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2d Cir.1985) (citation omitted). Waiver may be inferred, nevertheless, in certain circumstances where "a party ... engages in 'protracted litigation' that results in prejudice to the opposing party." *Kramer v. Hammond*, 943

F.2d 176, 179 (2d Cir.1991) (quoting *Com–Tech Assoc. v. Computer Assoc.*, 938 F.2d 1574, 1576 (2d Cir.1991)). "Prejudice" can be found "when a party too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay and expense." *Id.* (finding prejudice where suit commenced four years prior to invocation of arbitration clause and extensive pretrial litigation had taken place) (citing *Com–Tech*, 938 F.2d at 1576; *Rush*, 779 F.2d at 887–88); *see Rush*, 779 F.2d at 887 (finding of waiver not warranted where, prior to invoking arbitration clause, defendant extensively involved in litigation over eight months in the form of discovery, bringing a motion to dismiss and posing affirmative defenses). This type of prejudice is to be measured "contextually," considering the extent of the delay, the degree of litigation that has preceded the invocation of the arbitration clause, and the resulting burdens and expenses. *Id.*

May 8, 1992 when Tower filed its answer and counterclaims. Although this court ordered discovery to take place as to the square footage issue, this was over the Landlord's objection of May 13, 1992. On May 29, 1992, the Landlord submitted its Reply to Counterclaims, in which it raised ¶ 61(B)'s arbitration clause as an affirmative defense. At trial, which took place over a one-week period in the beginning of June, the square footage issue was litigated.

Thus, the Landlord's participation in the litigation over the square footage issue was neither "aggressive" or "extensive," as implicitly defined by the cases cited above. The subject was put in issue less than one month prior to trial, and then only over objection by the Landlord. Under these circumstances, the Landlord's interposition of ¶ 61(B) as an affirmative defense in its Reply negates the conclusion that it "affirmative[ly] accept[ed] ... the judicial forum"; the Landlord was essentially trapped into litigating this claim.

 As the New York Court of Appeals has stated, "where urgent need to preserve the status quo requires some immediate action which cannot await the appointment of arbitrators, waiver will not occur where plaintiff 'moves in court for protective relief in order to preserve the status quo while at the same time exercising its right under the contract to demand arbitration.'" *Sherrill*, 64 N.Y.2d at 273, 486 N.Y.S.2d at 163, 475 N.E.2d at 776.

 Even if the Landlord had waived its right to demand arbitration on this issue, however, the shortfall in square footage would not constitute an anticipatory repudiation of the Lease. Paragraph 61(B) specifically provides that the remedy for such an occurrence is a rent-reduction proportionate to the difference between the actual and projected square footage. Thus, the Landlord's conduct does not render substantial performance of the Lease impossible.

### Service Vestibule

 Paragraph 46(10) of the Lease requires the Landlord to construct a service vestibule for a service elevator. The Lease does not explicitly set forth in words the dimensions for the service vestibule, nor does Exhibit A to the Lease delineate the square footage of the service vestibule. Therefore, although Tower now argues that it was very important that the service vestibule be large enough for certain delivery and storage purposes, it never made the dimensions of this area a term of the Lease. Although the vestibule as constructed may be unfit for its intended use, it does not constitute an anticipatory repudiation of the Lease.

### Claim Relating to Noise from the Dalton Gymnasia is Premature

 When the Building's construction was changed from concrete to steel, the slab thickness of the floor between the Dalton gymnasia and the second floor of the Tower space was reduced from ten inches of concrete to 5¼ inches of concrete and steel deck. According to Tower, due to this change, the "impact noise" created by such things as bouncing balls and running feet will breach the covenant of quiet enjoyment contained in ¶ 22 of the Lease, which provides that: "Owner covenants and agrees with Tenant that upon Tenant paying rent and additional rent and observing and performing all the terms, covenants and conditions ... Tenant may peaceably and quietly enjoy the premises hereby demised...."

Although experts for parties testified that transmission of some impact noise is inevitable under the present construction, this claim is premature. First, as of this date, neither Tower nor Dalton is occupying its space; the gymnasia floors have not been installed; and no actual tests have been performed at the premises taking into consideration a finished floor and constantly playing music. As reported by the Landlord's expert, it is highly doubtful that a "real problem will occur," given the acoustical "insensitivity" of the Tower space. Thus, there is no evidence at this time establishing the extent to which impact noise will be perceived in the Tower space, if at all. Second, Tower does not yet

have the right to invoke ¶ 22's covenant of quiet enjoyment, which is triggered "upon Tenant paying rent and additional rent and observing terms, covenants and conditions...." Because Tower has not commenced performance of these obligations, ¶ 22 does not apply.

CONCLUSION

Upon the findings and conclusions set forth above, judgment will be entered granting the relief sought in the complaint, with costs. Tower's counterclaim and affirmative defenses will be dismissed. Submit judgments on notice.

It is so ordered.