**EMANUEL LAW OUTLINES, INC., Plaintiff,**

v.

**MULTI–STATE LEGAL STUDIES, INC., Defendant.**

**No. 93 Civ. 7212 (BN).**

United States District Court, S.D. New York.

Aug. 31, 1995.

Fischbein, Badillo, Wagner, Itzler, New York City, for Plaintiff; Gerry E. Feimberg, of counsel.

Lefkowitz & Edelstein, New York City, for Defendant; Jonathan Fisher, of counsel.

---

## OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

BERNARD NEWMAN, Senior Judge, by designation:[1]

Emanuel Law Outlines, Inc. (hereinafter "ELO"), a publisher of study aids for law students, brings this diversity action against Multi–State Legal Studies, Inc., (hereinafter "Multi–State"), a company that conducts state bar review preparation courses. ELO seeks $60,000 in damages for breach of contract; Multi–State counterclaims for $20,000 in damages, alleging breach of contract by ELO. This matter arises under the court's diversity jurisdiction in conformity with 28 U.S.C. § 1332(a), and the case was tried to the court in a one day bench trial. Pursuant to F.R.C.P. Rule 52(a), the following constitutes the court's findings of fact and conclusions of law.

## THE RECORD

ELO offered the following two witnesses: Lazar Emanuel (hereinafter Lazar), General Counsel and Vice President of ELO and Steven Emanuel (hereinafter Steven), President of ELO. Multi–State offered one witness, Robert Feinberg, Multi–State's President. The parties submitted 16 documentary exhibits.

## CONTENTIONS OF THE PARTIES

ELO contends that Multi–State's failure to pay the base fees for the second and third years of a three year installment contract breaches the agreement. According to the relevant terms of the contract, ELO was to provide Multi–State with a criminal procedure outline supplement (hereinafter "supplement") no later than May 1, 1993. Although the supplement was not delivered until June 3, 1993, ELO maintains that it performed its obligation under the contract. ELO argues that: (1) Multi–State orally agreed to change the May 1, 1993 contractual deadline to early June 1993; (2) any alleged breach was cured under the terms of the contract; (3) any alleged breach by ELO caused by failing to meet the May 1, 1993 deadline was not material; (4) the nonconforming delivery did not substantially impair the value of the entire contract; and (5) Multi–State reinstated the contract by accepting the supplement without seasonably notifying ELO of the breach.

Multi–State maintains that the failure of ELO to provide the supplements by May 1, 1993 constituted a breach of the agreement and excused Multi–State's obligations under the contract. Specifically, Multi–State disputes the existence of any modification or waiver of the May 1, 1993 deadline. It is further asserted by Multi–State that it sent ELO two letters, dated April 27, 1993 and May 7, 1993 respectively, informing ELO

---

1. Bernard Newman, Senior Judge of the United States Court of International Trade, sitting as . United States District Judge by designation.

that the failure to meet the May 1st deadline would be considered a material breach of the contract. When ELO did not provide the supplement by May 1, 1993, Multi–State claims that ELO breached the agreement and excused any further performance by Multi–State. Multi–State also insists that the failure to timely provide the supplement by the agreed-upon date caused damage to Multi–State's business in the amount of $20,000.

## FINDINGS OF FACT

Since 1978. ELO (a New York corporation) has been a leading publisher and distributor of study aids for law students. Steven is the main editor and writer of the Emanuel Law Outline series. The corporation is a continuation of the business started by Steven during his first year at Harvard Law School. The company enjoys an outstanding reputation among law students across the country. In addition to writing and editing, Steven negotiates transactions for the corporation. Lazar, Steven's father, is ELO's general counsel and administrative officer. An experienced attorney and businessman, Lazar runs the office, finalizes contracts, oversees all printing and production of materials, and supervises the collections of accounts.

Multi–State Legal Studies, Inc. (a California corporation) conducts bar review courses for law school graduates. The company, which employs approximately 15 people, offers courses in 42 states and is run by its president and founder Robert Feinberg, who is admitted to the bar of several states, including New York and California. As president of the company, Feinberg develops course materials, directs promotion and marketing of the company, and is one of Multi–State's principle lecturers around the country.

In August 1992, Feinberg contacted ELO to propose an agreement whereby ELO would provide materials which could be distributed to students enrolled in Multi–State's course. As a result, the parties entered into a three-year contract beginning September 1, 1992 and ending August 31, 1995. Under the contract, ELO was required to supply at least 950 copies of each of two volumes of capsule summaries in nine subjects tested on the California bar exam in each of the three years. Multi–State agreed to pay ELO a fee of $30,000 per year and in addition pay printing and delivery costs. ELO did not receive the second installment of the first year payment of $15,000 from Multi–State by the due date of December 1, 1992. Accordingly, Lazar wrote Feinberg at Multi–State informing him that the payment was overdue and Multi–State should either send payment or a signed note. On December 16, 1992, Multi–State issued its check in the sum of $15,000 to ELO. There were no other disputes regarding payment of the first year fees.

For all subjects except Constitutional Law and Criminal Procedure, ELO was required to take verbatim text of the Capsule Summaries it had published in the Emanuel Law Outline for the particular subject and cosmetically change them as required by Multi–State. For Constitutional Law, ELO was to prepare, edit, and revise a text outline from the review portion of the Constitutional Law Audio Tapes sold commercially by ELO. The Criminal Procedure Supplement was to be created from scratch by ELO, but be similar in format and detail to the other outlines provided to Multi–State.

Under the first year of the contract, ELO agreed to produce two volumes containing materials for eight of the subjects as well as a Criminal Procedure Supplement. The two volumes were to be delivered to ELO's warehouse no later than October 10, 1992, whereas the supplement, because it required more time for preparation, was to be delivered to the warehouse no later than May 1, 1993. There is no dispute that respecting the two volumes, ELO adequately performed under the contract.

In February 1993, Steven underwent quadruple bypass surgery. As a result of a six week convalescent period, he fell behind in his work on the supplement. Multi–State was informed of the upcoming surgery sometime in January 1993 (R. 131–32). ELO contends that in accordance with an early April telephone conversation between Steven and Feinberg, Multi–State orally agreed to move back the deadline for the production of

the supplement. Specifically, Steven testified that he told Feinberg he had fallen behind in his work due to the operation and while he could still meet the May 1, 1993 deadline, he hoped that the deadline could be "relaxed" (R. 85). Steven also stated that Feinberg told him a delay would be acceptable if the supplement was ready by "early June", and that it "doesn't sound like a big deal" (R. 86). The evidence presented by Multi–State directly conflicts with ELO's claim. Feinberg, in his testimony, flatly denies that he ever agreed to any change in the May 1, 1993 deadline. He emphatically stated that "[i]n 17 years of business, I can never remember one oral waiver that I would have agreed to" (R. 149–50).

Resolving this factual dispute, the court finds that there was insufficient evidence to establish any change in the May 1st deadline. First, ELO failed to produce written confirmation of any waiver. Considering the experience of both Steven and Lazar, it is likely that if such a change in terms of the contract were made, a confirmatory letter would have been sent by ELO to Multi–State. Moreover, it was demonstrated that ELO relied on the letter of the contract as evidenced by its written demand for payment very soon after the December deadline for the second installment. Accordingly, ELO did not treat changes in the terms of the agreement casually. In sum, no writing from Multi–State was ever produced to corroborate ELO's claim that there was any change in the May 1, 1993 deadline. Therefore, considering the experience of Steven and Lazar, the lack of any writing either sent to Multi–State or even kept in ELO's files, the practice of ELO to closely adhere to the contract terms, and the failure to produce any writing from Multi–State, the court finds the weight of the evidence in favor of Multi–State and concludes that there was no oral modification regarding the May 1, 1993 deadline.

However, another factual dispute arises regarding Multi–State's claim that two letters were sent to ELO regarding the May 1 deadline. The first letter, dated April 27, 1993, purportedly notified ELO that failure to meet the May 1 deadline would be considered a material breach of the agreement. The second letter, dated May 7, 1993, purportedly canceled Multi–State's obligations under the contract based on ELO's failure to meet the May 1 deadline. ELO, on the other hand, insists that it did not receive either letter.

The court concludes that ELO did not receive either letter. As a member of the bar of several states including New York, a lecturer on the law, an experienced businessman, and negotiator of the contract, Feinberg must have been aware that the contract specifically called for *receipt* of notice by the breaching party[2]. Additionally, Feinberg admitted knowledge that ELO would hold him to the specifics of the contract. ELO was, in Feinberg's words, "sticklers" regarding the agreement (R. 186). Further, Feinberg testified that these letters, supposedly notifying ELO of a material breach, were sent by ordinary mail, rather than a method which provides proof of receipt. This is significant because *receipt* of written notice of a claimed breach by the breaching party was a critical factor under the contract. Finally, if these letters were received, common sense dictates that there would be some response from ELO regarding the letters. Not only was Multi–State unable to produce evidence of any written response from ELO, but Feinberg never clearly demonstrated that there was any oral response. Based on the evidence presented, even if the court were to assume the letters were sent, the evidence is insufficient to find that either letter was received by ELO.

When the May 1 deadline passed, Multi–State contacted ELO by phone stating that the materials were needed, to which ELO replied that the supplement was being rushed and that it would be forthcoming. Regarding the materials, a third factual dispute arises. The parties agree that the ELO

2. The contract states: "9.(a) Initial Term: Neither party may terminate this Agreement during the Initial Term, except on account of a material breach by the other, which breach shall have gone uncured for 30 days after the breaching party has *received* written notice of breach (which notice shall contain specific details of the breach) from the non-breaching party." (emphasis added), *see* Plft's. Exh. 1.

materials were to be utilized by Multi–State bar review course to help marketability, improve the quality of the materials, and give the Multi–State students additional materials for study purposes. Feinberg further argues that he needed the supplement to help prepare his criminal procedure "early-bird"[3] lecture (R. 154–55). ELO responds that the materials were not meant to be used either for lecture preparation or as reference points in any of the lectures (R. 81).

The court credits the position of ELO and determines that the primary purpose of the outlines was to act as a supplement to Multi–State's materials and not as a research or reference tool for lecturers. Multi–State had its own outlines, and for seventeen years has been conducting reviews specifically for the multi-state portion of the bar examination of which Criminal Procedure is a part. It is difficult to imagine that a lecturer of Feinberg's experience would need to rely on an outline prepared by another company. Indeed, the fact that the lecture was scheduled only 17 days after the contractual due date for the materials to arrive at ELO's warehouse, renders it unlikely that any lecturer would have been able to substantially rely on those materials for preparation. Convincingly, Feinberg himself testified that the reason for entering into the agreement with ELO was because he "thought that would help me from a marketing standpoint and also to improve the quality of my materials" (R. 127). While the supplement may have been used in some small degree for reference purposes, the weight of the evidence supports ELO's view of the supplement's primary use.

The supplement did arrive at ELO's warehouse on June 3, 1993. After having the materials shipped by UPS, Multi–State received the materials on June 10, 1993 and distributed them to the students. Multi–State maintains that the late delivery caused substantial damage to its reputation. Stress-

ing that the "key in our business is word of mouth," Multi–State argues that student satisfaction with the course is critical (R. 148). Although Feinberg testified that there were numerous complaints about the late shipment, no documentary evidence was produced regarding any negative feedback received by Multi–State[4].

On August 19, 1993 under the terms of the contract, ELO wrote Multi–State requesting instructions for printing and delivery of the materials for the second year of the contract. On August 23, 1993 Multi–State sent a fax to ELO stating that ELO's failure to deliver the supplement by the May 1 deadline constituted a material breach of the contract and consequently Multi–State was excused from all future obligations under the contract. This fax constituted the last correspondence between the parties.

## DISCUSSION

By the terms of the contract, this case is governed by New York law. Since this action involves a contract for the sale of goods, New York's version of the Uniform Commercial Code is the applicable legal authority. Because the court concludes that there is insufficient evidence of any modification of the May 1, 1993 deadline for the supplement, the failure to print the supplement by that date constitutes a breach of contract. While the failure to meet the deadline constituted a breach, the court credits ELO's contentions that the breach was subsequently cured as provided by the agreement and in any case, the delay was not a material breach. Accordingly, Multi–State was still bound by the contract.

### A.

■ Multi–State did not give ELO adequate notice of the breach as required by the agreement. The contract unequivocally re-

---

3. The "Early Bird Lecture Series" is a short review of each of the multi-state subjects held in mid-May. The regular course schedule began in early June.

4. After the 1993 Bar examination, Multi–State decided not to continue its full service California course. Feinberg stated the reason for this decision was "because we entered into a license

agreement with Barpassers, another California course, and the license under the terms of the license agreement, basically we were assigning our rights to certain materials to them and they were assigning their rights to Multi–State question to us. So we made a business decision" (R. 193).

quires that the agreement may not be terminated unless the breaching party *receives* written notice of the breach and such breach is not cured more than 30 days after the receipt of such notice. New York law states, "[a] person *receives* a notice or notification when (a) it comes to his attention; or (b) it is duly delivered to [his] place of business ..." N.Y.U.C.C. § 1–201(26) (emphasis in the original). In this case, there was inadequate evidence to prove that ELO received either the April 27th or May 7th letter. Accordingly, ELO did not have notice of the breach.

■ Multi–State's claim that N.Y.U.C.C. § 2–607 does not require notice of a contract breach be received, is inapplicable to this case. While Multi–State accurately states the provision of § 2–607, it ignores the fact that in this case there was a specific provision requiring *receipt* of written notice of a breach. It is recognized within the Code itself that parties may vary the terms of the statute and determine the standards by which performance of obligation is to be measured under the code, as long as the variations do not disclaim the obligations of good faith, diligence, reasonableness, care and the standards are not manifestly unreasonable. N.Y.U.C.C. § 1–102; *see also, Prompt Elec. Supply Co. v. Allen–Bradley Co.,* 492 F.Supp. 344, 347–48 (E.D.N.Y.1980); *Dulman v. Martin Fein & Co.,* 66 A.D.2d 809, 810, 411 N.Y.S.2d 358, 359 (2d Dept.1978) (the code is to be interpreted "to allow businessmen to make the terms of their own contracts and to allow them to arrange their own affairs among themselves within the bounds of reason and fair play"). It cannot be said that the written receipt of notice requirement is unreasonable. Moreover, the court concludes that the clear and unambiguous language of the agreement, manifests the intentions of the parties. "The primary objective in contract interpretation is to give effect to the intent of the contracting parties as revealed by the language they chose to use". *Sayers v. Rochester Telephone Corp.,* 7 F.3d 1091, 1094 (2d Cir.1993); *Nicholas Laboratories Ltd. v. Almay, Inc.,* 900 F.2d 19, 21 (2d Cir.1990) (Under N.Y. law, the parties' intent will be determined by looking to the written agreement). "There is a heavy presumption that a deliberately pre-pared and executed written instrument manifests the true intentions of the parties". *George Backer Mgt. Corp. v. Acme Quilting Co.,* 46 N.Y.2d 211, 219, 413 N.Y.S.2d 135, 139, 385 N.E.2d 1062, 1066 (1986); *Quantum Chemical Corp. v. Reliance Group Inc.,* 180 A.D.2d 548, 548–49, 580 N.Y.S.2d 275, 276 (1st Dept.1992).

Multi–State offered no proof to demonstrate that the specific provision mandating written notice of a breach be received by the breaching party was not intended to be read in any way but its plain meaning. Nothing put forward indicated that Multi–State was dissatisfied or wanted to change the contract provision requiring the notice of a breach to be received. Certainly if Multi–State did not want the notice provision to apply to a breach regarding the May 1 deadline, obviously it could have so provided within the contract. In the absence of any proof demonstrating contrary intent, the court holds the provision is applicable to any claim of breach regarding the May 1 deadline. Since no notice of a breach was received by ELO prior to its performance on June 3, this Court finds that ELO cured any breach within the guidelines of the agreement. Hence, Multi–State presents no valid basis to justify non-performance of the contract.

**B.**

■ Even if the Court were to agree that there was an uncured breach of contract by ELO, Multi–State's right to be relieved of its obligations requires a demonstration of substantial impairment of the whole contract. Inasmuch as this contract requires the delivery of goods in separate lots to be separately accepted, it is an installment contract as defined by N.Y.U.C.C. § 2–612(1). Under § 2–612(3), Multi–State's right to cancel the entire agreement required a showing of substantial impairment of the whole contract. Whether a breach constitutes "substantial impairment" is a question of fact. *Stinnes Interoil v. Apex Oil Co.,* 604 F.Supp. 978, 981 (1985). When there is no predicate for finding that the breach substantially impaired the value of the contract, there is no basis for the buyer to repudiate the contract. "[A] late shipment of one installment may be

treated as a breach of the entire contract only if the default with respect to one or more installments substantially impairs the value of the whole contract." *Trans Works Metals Inc. v. Southwire Co.*, 769 F.2d 902, 907 (2d Cir.1985) (*citing* N.Y.U.C.C. § 2–612(3)). Here, there is no evidence to support Multi–States argument that failure to have the supplements ready by May 1, 1993 substantially impaired the entire contract.

Multi–State's only contention with regard to damages is that the company received oral complaints from students enrolled in the course. This claim is tenuous at best, considering that Multi–State offered no proof of any written complaints, nor did it provide any written records of the complaints, and it failed to show that it had to refund any tuition money to students. Moreover, Multi–State's students did in fact receive eight of the nine promised outline on time and subsequently received the supplement more than a month prior to the bar exam.

Finally, Multi–State's own actions demonstrate the minor nature of any breach. When ELO shipped the goods in June, Multi–State made no effort to expedite delivery. Because it was responsible for the cost of shipping, it could have utilized any delivery method it desired, including overnight mail. Instead, Multi–State opted for UPS delivery, which is far from the fastest method. Inasmuch as Multi–State's actions do not indicate significant urgency, it would be very difficult for the court to so find.

Nor can it be said that the June delivery of the supplements had any effect on future enrollment in Multi–State's course. After the 1993 course, Multi–State no longer offered the full service California bar review course. It is undisputed that Multi–State's decision was unrelated to the instant action. Since Multi–State no longer offered the full service course, ELO's breach could not have had any damaging effect whatsoever for subsequent years.

The very purpose of the substantial impairment requirement of N.Y.U.C.C. § 2–612(3) is to preclude a party from canceling the contract for trivial defects. Multi–State has failed to demonstrate any substantial or lingering harm incurred from ELO's failure

to have the supplement ready by May 1, 1993. Accordingly, Multi–State had no legal justification for not performing on the contract.

### C.

 ELO seeks an award of $60,000 in damages as measured by the minimum contract price, less the cost of performance, which ELO asserts is zero. It is undisputed that Multi–State's minimum obligation for the second and third years of the contract is $60,000. Since the outlines were already prepared during the first installment year, ELO's obligation, for years two and three of the agreement was limited to updating the outlines. No proof was put forward by Multi–State indicating that ELO would have incurred additional expenses. Accordingly, the court credits ELO's contention and determines the cost of performance amounts to zero. Moreover, outside costs for printing and shipping were to be borne by Multi–State, and therefore, ELO's damages incurred by Multi–State's breach amounts to $60,000.

 Repudiation of a contract occurs when "there has been an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." *Teachers INS. & Annuity v. Coaxial Communications*, 807 F.Supp. 1155, 1159 (S.D.N.Y.1992); *200 East 87th Street Associates v. MTS, Inc.*, 793 F.Supp. 1237, 1253 (S.D.N.Y.1992); *see also*, N.Y.U.C.C. § 2–610. Here, there can be no doubt that Multi–State's fax sent to ELO on August 23, 1993 unequivocally repudiated the contract. It is equally clear that "a wrongful repudiation of the contract by one party before the time for performance entitles the nonrepudiating party to immediately claim damages for a total breach." *American List v. U.S. News*, 75 N.Y.2d 38, 40, 550 N.Y.S.2d 590, 593, 549 N.E.2d 1161, 1164 (1989) (New York Court of Appeals holding that after buyers agreed to a 10 year contract but canceled after one year, damages in the amount of the entire contract price was proper). Appropriate damages are those "general damages

which are the natural and probable consequence of the breach." *Kenford Co. Inc. v. County of Erie*, 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 3, 537 N.E.2d 176, 178 (1989). The natural and probable consequence of the breach by Multi–State would be the $60,000 ELO was still to receive for the second and third years.

■ ELO's failure to sell the prepared outlines elsewhere in order to mitigate damage is of no moment. There appears to have been no realistic possibility that ELO would have been able to resell the outlines at a reasonable price. In an action to recover the balance due on an installment contract, the seller may recover "the price of goods identified in the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing". N.Y.U.C.C. § 2–709(1)(b). The evidence clearly demonstrates that the outlines prepared to Multi–State's specifications have no value to other buyers. As both parties agreed, Multi–State's only competitors in the California bar review market, BAR–BRI and BarPassers, already possessed their own materials. Indeed, Multi–State presented evidence that the reason it approached ELO was to increase the number of its materials to approach the amount of materials the other courses already offered to their students. Accordingly, ELO is entitled to damages in the amount of $60,000.

### D.

■ Multi–State is not entitled to any damages on its counterclaim. As previously discussed, Multi–State has failed to prove that it incurred any significant damage. Although it claims that ELO caused "irreparable damage to its reputation", Multi–State did not present evidence to support this assertion. The short of the matter is that Multi–State failed to submit any proof of damages other than Feinberg's bald testimony that some students complained. Multi–State failed to show any declining enrollment, withdrawals from the course, written complaints from students, or even memoranda it kept regarding the complaints. Hence, Multi–State has not demonstrated irrepara-

ble damage to its reputation. Without more, the court dismisses out of hand Multi–State's counter claim.

### CONCLUSION

With regard to ELO's claim, the court determines that while ELO's delay in delivering the supplement breached the agreement it was cured under the terms of the contract. Moreover, the delay in delivery did not substantially impair the value of the instant contract with Multi–State. Accordingly, Multi–State was not entitled to cancel its performance thereof. Therefore, ELO shall recover the sum of $60,000 plus prejudgment interest at the New York statutory rate accruing from August 23, 1993, which represents the date when Multi–State repudiated the contract. Further, Multi–State's counterclaim is hereby dismissed. Each party shall bear its own expenses.

The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**